**Ricardo Abastillas SABINO, Petitioner,**

v.

**Janet RENO, U.S. Attorney General, et al., Respondents.**

No. CIV. A. H–97–3884.

United States District Court,
S.D. Texas,
Houston Division.

June 1, 1998.

---

4. The Court commends counsel for all parties for the excellent work in this case.

Imran B Mirza, Attorney at Law, Houston, TX, for Petitioner.

Howard E Rose, Office of U.S. Attorney, Houston, TX, for Respondents.

## OPINION AND ORDER

LAKE, District Judge.

Ricardo Sabino, a citizen of the Phillippines who became a legal resident of the United States in 1983, filed this application for writ of habeas corpus on November 26, 1997, to challenge an order of the Immigration and Naturalization Service (INS) excluding him from the United States. Sabino is married to a legal resident and has three children who are United States citizens. Sabino was convicted of a drug offense during a 1991 trip to Japan, which customs officials discovered upon his return to the United States in 1992. The Attorney General and the District Director of the INS have moved to dismiss the case for lack of subject matter jurisdiction. The motion to dismiss raises a number of complex jurisdictional issues.

## I.

United States immigration law has traditionally distinguished between the exclusion of aliens who arrive at our shores seeking admission and the deportation of aliens who are physically present within the United States, whether they entered with permission or illegally. *See Leng May Ma v. Barber,* 357 U.S. 185, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958). In the Immigration and Nationality Act (INA) of 1952, which provided the basic framework for immigration proceedings until 1996, the grounds for exclusion were broader than those for deportation. For example, when Sabino returned from Japan in 1992 an alien could be excluded—but not deported—because of poor health, present or past membership in Communist and other totalitarian political parties, the immigration officer's determination that the alien was likely to become a public charge, and other reasons. *Compare* 8 U.S.C. § 1182 (1994)[1] *with id.* § 1251 (1994). *But see id.* § 1251(a)(1) (1994) (providing that an alien is deportable if he was excludable under any of the grounds listed in § 1182 at the time of

---

1. A number of the statutes discussed in this Opinion, including the statute cited above, were either modified or repealed in 1996 as described below. In this Opinion use of the parenthetical date 1994 after a citation to the United States Code means that the statute has been modified or repealed. When the court cites to the United States Code without using a parenthetical date, the citation is to the current version of the statute.

his entry). In addition, aliens in deportation proceedings had procedural protections and other privileges that were not available in exclusion proceedings. *See Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982).

Exclusion and deportation have always been considered civil rather than criminal proceedings, and no jury trial is required. *See Carlson v. Landon,* 342 U.S. 524, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952); *Fong Yue Ting v. United States,* 149 U.S. 698, 13 S.Ct. 1016, 1028–29, 37 L.Ed. 905 (1893). Early Supreme Court cases established that Congress has broad, plenary power over immigration policy and procedures. *See, e.g., Fong Yue Ting,* 13 S.Ct. at 1020; *Lem Moon Sing v. United States,* 158 U.S. 538, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895); *Nishimura Ekiu v. United States,* 142 U.S. 651, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). In *Lem Moon Sing* the Court stated:

> The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

15 S.Ct. at 970. Congress's power to determine the grounds for excluding and deporting aliens has never been successfully challenged. *See Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) ("The Court without exception has sustained Congress' 'plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden.'") (citation omitted). By 1911, however, the Supreme Court had established that resident aliens in deportation proceedings were entitled to the protection of the Due Process Clause. *See Kwock Jan Fat v. White,* 253 U.S. 454, 40 S.Ct. 566, 567, 64 L.Ed. 1010 (1920) (holding that agency decision "is final, and conclusive upon the courts, unless it be shown that 'authority was not fairly exercised, that is, consistently with the fundamental principles of justice embraced within the conception of due process of law,'") (citing *Tang Tun v.*

*Edsell,* 223 U.S. 673, 32 S.Ct. 359, 363, 56 L.Ed. 606 (1912)); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) ("It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of the Fifth Amendment. He may not be deprived of his life, liberty or property without due process of law."). Aliens seeking initial admission into the United States, on the other hand, have virtually no constitutional protections. *See United States ex rel. Knauff v. Shaughnessy,* 338 U.S. 537, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.").

The differences between exclusion and deportation proved troublesome with respect to the class of aliens to which Sabino belongs—lawful permanent residents returning from a trip abroad. In *United States ex rel. Volpe v. Smith,* 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298 (1933), the Supreme Court held that a resident alien's return to the United States after a brief visit to Cuba constituted an "entry" within the meaning of the Immigration Act of 1917. The alien was found excludable on a ground that would probably not have made him deportable. *Id.* at 667. Later the Court created an exception to *Volpe* for aliens who depart the country unintentionally. *See Delgadillo v. Carmichael,* 332 U.S. 388, 68 S.Ct. 10, 12, 92 L.Ed. 17 (1947) (holding that alien's return from Cuba was not an entry because merchant ship on which he was sailing was torpedoed by German submarine, resulting in alien being rescued and taken to Cuba temporarily). In the 1952 INA Congress adopted both the *Volpe* Court's understanding of reentry and the exception in *Delgadillo. See* 8 U.S.C. § 1101(a)(13) (1994) (stating that "entry" means "any coming of an alien into the United States," but not the return from an unintended, unexpected, or involuntary departure to a foreign country). In *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), however, the Supreme Court broadly construed the § 1101(a)(13) exception and held that a resident alien's return from an "innocent, casual and brief" excur-

sion to another country does not constitute an "entry." *Id.* at 1812. For many years it was unclear whether a returning resident had due process rights. In *Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), the Court held that a resident alien could "invoke the Due Process Clause on returning to this country, although we do not decide the contours of the process that is due . . . ." *Id.* at 329.

In the recently enacted Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 545, Congress merged exclusion and deportation into a single process called "removal." *See* 8 U.S.C. § 1229a. Congress preserved, however, the broader substantive grounds for denying aliens admission to the United States in 8 U.S.C. § 1182, changing the term "excludable" to "inadmissible." *See* 8 U.S.C. § 1182(a). Generally, aliens are no longer classified according to whether they are physically present in the United States, but by whether they have been lawfully admitted into the United States. An alien who has never been admitted is "removable" if found to be "inadmissible" under § 1182. *See* 8 U.S.C. § 1229a(e)(A); *id.* § 1101(a)(13)(A) (defining "admitted" as lawfully admitted after inspection and authorization by an immigration officer and eliminating the definition of "entry" in the old 8 U.S.C. § 1101(a)(13)(1994)). Aliens who have been admitted must be found "deportable" under the narrower grounds in 8 U.S.C. § 1227 (a recodified version of the old 8 U.S.C. § 1251 (1994)) in order to be removed from the United States. *See* 8 U.S.C. § 1229a(e)(B). The special category of the returning resident alien remains, however. An alien who has once been admitted may be regarded as an "applicant seeking admission" if he leaves the country for more than 180 days, engages in illegal activity while he is gone, or has committed an offense identified in 8 U.S.C. § 1182(a)(2). *See* 8 U.S.C. § 1101(a)(13)(C).

Although exclusion and deportation proceedings under the 1952 INA had a number of differences, several basic principles and procedures were common to both, and many of those remain applicable in the new removal proceedings. The Attorney General enforces immigration laws through the INS, a division of the Department of Justice. *Johns v. Department of Justice,* 653 F.2d 884, 889 (5th Cir.1981). An alien attempting to enter (or reenter) the United States who "may not appear to the examining officer at the port of arrival to be clearly and beyond a doubt entitled to land" is detained for further inquiry. 8 U.S.C. § 1225(b) (1994). The INS can "parole" the alien into the United States pending outcome of the inquiry without changing his status. *See* 8 U.S.C. § 1182(d)(5)(A) (1994); *Leng May Ma,* 78 S.Ct. at 1074 (holding that such parole does not entitle entering alien to deportation proceedings). A "special inquiry officer," commonly called an immigration judge, conducts a hearing to determine whether an alien such as Sabino is excludable. *See* 8 U.S.C. § 1226(a) (1994). *Cf.* 8 U.S.C. § 1252(b) (1994) (special inquiry officer also presides in deportation proceedings).[2] The immigration judge is an officer of the Department of Justice but independent of the INS. *Rafeedie v. INS,* 880 F.2d 506, 507 (D.C.Cir.1989).

Aliens in both exclusion and deportation proceedings have the right to be represented by counsel, but at their own expense. *See* 8 U.S.C. § 1362 (1994). An alien in deportation proceedings also has certain procedural safeguards, including the right to advance notice of the charges against him and to cross-examine witnesses, that are not guaranteed by statute in exclusion proceedings. *Compare* 8 U.S.C. § 1252(b)(1)-(4) (1994) *with* 8 U.S.C. § 1226(a) (1994) (directing immigration judge to interrogate and cross-examine witnesses in exclusion proceedings). By regulation the INS extended some of these safeguards to aliens in exclusion proceedings, but not the right to advance notice. *See* 8 C.F.R. § 236.2(a) (directing immigration judge to inform alien that he has the right to present evidence on his own behalf and to cross-examine witnesses).[3] The bur-

---

**2.** The newly amended INA adopts the common usage of "immigration judge" and discards the term "special inquiry officer." *See* 8 U.S.C. § 1229a.

**3.** Although 8 C.F.R. § 236.2 requires the immi-

den of proof is on the INS in deportation proceedings, but on the alien in exclusion proceedings. *See* 8 U.S.C. § 1361 (1994).[4] In *Kwong Hai Chew v. Rogers*, 257 F.2d 606 (D.C.Cir.1958), however, the court held that if the alien in exclusion proceedings is a returning resident the INS must bear the burden of proof. And in *Landon* the Supreme Court indicated that a returning resident is entitled to advance notice of the charges against him. *See* 103 S.Ct. at 331 (remanding case in which resident alien was given only eleven hours' notice of hearing for assessment of this and other due process issues).

An alien in exclusion proceedings can apply to the immigration judge for a discretionary *waiver of excludability if certain conditions* are met. The alien must be returning to "an unrelinquished domicile of seven consecutive years" after temporarily proceeding abroad, and must not have a conviction for an aggravated felony. *See* 8 U.S.C. § 1182(c) (1994).[5]

Decisions of the immigration judge can be appealed to the Board of Immigration Appeals (BIA), a body appointed by the Attorney General. *See Johns*, 653 F.2d at 889; 8

C.F.R. § 242.21; *id.* § 3.1(a). The decision of the BIA is administratively final unless the case is referred to the Attorney General. *See Johns*, 653 F.2d at 889; 8 C.F.R. § 3.1(d)(2). The 1952 INA made no provision for direct judicial review of deportation or exclusion orders, but when it was enacted aliens in custody could seek review by a writ of habeas corpus. A 1961 amendment to the INA permitted aliens under deportation orders to seek direct review in the courts of appeals, but aliens under exclusion orders were limited to review by writ of habeas corpus proceedings. *See* 8 U.S.C. § 1105a(a), (a)(10) & (b) (1994).

## II.

During his 1991 trip to Japan Sabino was arrested for either possession or distribution of LSD. The Japanese court documents have not been translated and the record is unclear as to the exact nature of the offense.[6] He pleaded guilty and served two months in a Japanese jail. Sabino returned to the United States in February of 1992 and attempted to pass through customs at the Detroit Metro Airport. Customs agents discovered in his

---

gration judge to inform the alien of the nature and purpose of the exclusion hearing, there is no requirement for how long in advance of the hearing such notice must be given.

4. Similarly, the newly amended INA requires aliens who have not been admitted to bear the burden of proving they are not inadmissible. *See* 8 U.S.C. § 1229a(c)(2).

5. In an odd twist, the potential waiver of excludability was much more generous than an analogous provision for "suspension of deportation" and "adjustment of status" offered to aliens in deportation proceedings. *See* 8 U.S.C. § 1254(a)(1)–2 & § 1255 (1994). In *Francis v. INS*, 532 F.2d 268 (2d Cir.1976), the court held that making the waiver in 8 U.S.C. § 1182(c) available to aliens in exclusion proceedings but not in deportation proceedings violated the Equal Protection clause. *Id.* at 273 (noting a deportable resident who sojourns in Bermuda and upon return is placed in exclusion proceedings would be eligible for a discretionary waiver under § 1182(c)). *Francis* was universally adopted by the other courts of appeals. *See Jurado–Gutierrez v. Greene*, 977 F.Supp. 1089, 1092 (D.Colo.1997).

In the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132,

110 Stat. 1214, Congress amended 8 U.S.C. § 1182(c) to state that "[t]his subsection shall not apply to an alien who is deportable by reason of having committed [certain criminal offenses]." *See* AEDPA § 440(d), 110 Stat. 1277. The Attorney General opined that AEDPA section 440(d) applied to pending cases, *see In re Soriano*, Int. Dec. No. 3289, 1996 WL 426888 (A.G.Slip.Op. *June 27, 1996), and the BIA determined that this* amendment applied to deportable, but not excludable, aliens. *In re Fuentes–Campos*, Int. Dec. No. 3318, 1997 WL 269368 (BIA May 14, 1997). These decisions prompted a tremendous amount of litigation over whether section 440(d) should be applied retroactively and whether it violated the Equal Protection Clause. *See, e.g., Cruz v. Reno*, 6 F.Supp.2d 744 (N.D.Ill.1998). But since this is an exclusion case, section 440(d) has no effect on Sabino's right to a waiver under 8 U.S.C. § 1182(c).

The IIRIRA repealed 8 U.S.C. § 1182(c), *see* IIRIRA § 304(b), 110 Stat. 3009–597, replacing it with a much more restrictive process called "cancellation of removal." *See* 8 U.S.C. § 1229b(a) & (d)(1). But this change does not apply to cases pending before April 1, 1997. (*See infra* section IV for discussion of effective date of the IIRIRA.)

6. *See infra* section VII.

possession the documents pertaining to his LSD conviction as well as a fraudulent green card. The INS decided to institute exclusion proceedings but released Sabino on parole.

At a July 30, 1992, hearing an immigration judge determined that Sabino was excludable under 8 U.S.C. § 1182(a)(2)(A)(I)(II) (1994) because he admitted committing acts that constituted the essential elements of a violation of Japanese narcotics laws. Sabino applied for a discretionary waiver of excludability pursuant to 8 U.S.C. § 1182(c) (1994), and a hearing on this issue was held on January 27, 1993. Sabino and his wife testified on his behalf, and Sabino's sister-in-law testified on behalf of the INS. The immigration judge decided not to grant Sabino a waiver.

Sabino's appeal to the BIA was denied on August 27, 1997. Sabino filed an application for writ of habeas corpus in this court on November 26, 1997, arguing that the BIA violated due process requirements and abused its discretion by applying a different legal standard from the one used by the immigration judge to evaluate the merits of his request for discretionary relief. He seeks to enjoin the INS from deporting him.

### III.

The court must first determine whether it has jurisdiction over Sabino's application for writ of habeas corpus and, if so, the proper scope of review. These questions are complex because they involve the interaction of a number of statutory schemes: (1) the 1952 INA; (2) the traditional writ of habeas corpus, 28 U.S.C. § 2241, under which Sabino claims jurisdiction; (3) the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, which defines the general standards for judicial review of agency action; (4) INA section 106, 8 U.S.C. § 1105a (1994), enacted in 1961, which permitted direct review in the appellate courts for deportation orders but only habeas review for exclusion orders; (5) the Anti–Terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, which amended INA section 106 to restrict the availability and scope of judicial review of immigration proceedings;

and (6) the IIRIRA, which provides transitional rules that further alter the availability and scope of review under INA section 106, but also includes a provision for judicial review of the new removal proceedings that arguably has retroactive effects. To understand what Congress has wrought, some appreciation of the history of judicial review of immigration proceedings is necessary. Because the writ of habeas corpus plays an important role in that history, the court will begin with a brief review of its origins.

### A.

At common law there were a number of types of writs of *habeas corpus*. 3 William Blackstone, Commentaries *129. The most well-known, *habeas corpus ad subjiciendum*, was "directed to the person detaining another, and commanding him to produce the body of the prisoner with the day and cause of his caption and detention." *Id.* * 131. If the application for the writ showed a probable ground for establishing imprisonment without just cause, the writ was issued and the prisoner produced before the issuing court. Upon examination of the validity of the confinement, the court could discharge the prisoner, release him on bail, or remand for further proceedings. *Id.* * 134. Blackstone called this the "great and efficacious writ." *Id.* * 131.

The Suspension Clause of the Constitution provides that the "privilege of the Writ of Habeas Corpus shall not be suspended except in times of rebellion or invasion." U.S. Const. art. 1, § 9, cl.2. In *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807), Chief Justice Marshall held that because federal courts possess no inherent common law jurisdiction, the power to grant the writ of habeas corpus must be given by written law. *Id.* at 93. Because the Constitution itself does not authorize courts to grant the writ, the Suspension Clause was not effectual until Congress gave federal courts the power to grant the writ of habeas corpus. *Id.* at 94.

In the Judiciary Act of 1789 the first Congress authorized federal courts to grant the writ of habeas corpus [7] for the purpose of an

---

7. "Habeas corpus," as used in the Judiciary Act,

means the Great Writ, *habeas corpus ad subji-*

inquiry into the cause of commitment when a prisoner is "in custody under or by color of the authority of the United States, or [is] committed for trial before some court of the same." Act of September 24, 1789, ch. 20, § 14, 1 Stat. 81. This provision is the direct ancestor of 28 U.S.C. § 2241(c)(1), which uses almost identical language. *See Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 n. 1 (1996).

### B.

Until 1961 immigration statutes made no provision for judicial review of exclusion or deportation proceedings. But aliens subject to deportation orders, if they were not already being held, had to be taken into custody at some point for the purpose of executing the order of deportation.[8] And aliens under orders of exclusion were considered to be in custody even though they were free to go anywhere in the world except into the United States. *See Nguyen Da Yen,* 528 F.2d 1194, 1203 n. 16 (9th Cir.1975). Aliens in custody had the opportunity to apply for writs of habeas corpus, and federal courts began using the writ to review immigration proceedings as early as 1892. *See Nishimura v. Ekiu v. United States,* 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146 (1892) ("An alien immigrant, prevented from landing by any such officer claiming authority to do so under an act of congress, and thereby restrained of his liberty, is doubtless entitled to a writ of habeas corpus to ascertain whether the restraint is lawful."). Habeas corpus remained the only method of obtaining judicial review of exclusion and deportation proceedings until the 1950's. Although aliens attempted to use injunctions, declaratory judgments, and other types of relief for this purpose, courts consistently rejected those attempts. *See Heikkila v. Barber,* 345 U.S. 229, 73 S.Ct. 603, 604, 97 L.Ed. 972 (1953).

In 1946 Congress enacted the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06, to govern the judicial review of agency action. Two circuit courts of appeal soon concluded that aliens could seek review of deportation proceedings under the APA. *United States ex rel. Trinler v. Carusi,* 166 F.2d 457, 460–61 (3d Cir.1948) (approving "petition for review" as proper form of action); *Prince v. Commissioner,* 185 F.2d 578, 580 (6th Cir.1950) (same). This meant that an alien under a deportation order would no longer have to wait until he was taken into custody to challenge the order in court. *Trinler* at 460–61; *Prince* at 580. In 1953, however, the Supreme Court rejected these decisions. *Heikkila,* 73 S.Ct. at 606.[9] The APA does not apply if a statute precludes judicial review. *See id.* at 604 n. 3. The Immigration Act of 1917 provided that the decisions of the Attorney General were "final," and the Court held that the act "clearly had the effect of precluding judicial intervention in deportation cases except insofar as required by the Constitution." *Id.* at 604–06. The Court held that the APA did not enlarge the alien's rights. "Now, as before, he may attack a deportation order only by habeas corpus." *Id.*

Two years later the Supreme Court reversed course and held in *Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955), that aliens could seek review of deportation proceedings under the APA. In 1952 Congress replaced the 1917 Immigration Act with the Immigration and Nationality Act (INA), which had not taken effect in time to be considered in *Heikkila. See Pedreiro,* 75 S.Ct. at 593. In an opinion authored by Justice Black, who had dissented in *Heikkila,* the Court held that *Heikkila's* rationale did not apply to the 1952 INA, even though it, like the 1917 Act, provided that the decisions of the Attorney General were "fi-

*ciendum. See id.* at 95; *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 3042 n. 6, 49 L.Ed.2d 1067 (1976).

**8.** *See Umanzor v. Lambert,* 782 F.2d 1299 (5th Cir.1986) (holding that alien whose attorney filed writ of habeas corpus after alien boarded plane to be deported but before plane left United States airspace was in custody).

**9.** In a third case, *Kristensen v. McGrath,* 179 F.2d 796, 798 (D.C.Cir.1949), the court had held that a declaratory judgment under the APA was a permissible form of review of deportation proceedings. The Supreme Court upheld *Kristensen,* distinguishing it from *Trinler* and *Prince* because it involved a claim of eligibility for citizenship. *Heikkila,* 73 S.Ct. at 607.

nal." *See Pedreiro,* 75 S.Ct. at 593–94. The difference was that the 1952 INA was enacted *after* the APA, which provided that "[n]o subsequent legislation shall be held to supersede or modify the provisions of this act except to the extent that such legislation shall do so expressly." *Id.* at 593. The Court concluded that the 1952 INA contained no language expressly modifying or superseding the right to judicial review granted by the APA. *Id.* at 593–94.

The form of action in *Pedreiro,* as in *Prince* and *Trinler,* was a "petition for review" filed initially in the district court.[10] In *Brownell v. We Shung,* 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956), the government argued that *Pedreiro* did not extend to exclusion orders. The Court rejected this argument and held that both exclusion and deportation orders could be challenged by a declaratory judgment action under the APA, or by habeas corpus if the alien was in custody. *Id.* at 254–56.

## C.

In 1961 Congress enacted INA section 106, which provided that the "sole and exclusive procedure for the judicial review of all final orders of deportation" would be direct review in the courts of appeal under the Hobbs Act.[11] *See* INA § 106, 8 U.S.C. § 1105a(a) (1994). Aliens under exclusion orders, however, could obtain judicial review only in habeas corpus proceedings. *See* 8 U.S.C. § 1105a(b) (1994). Congress also permitted habeas corpus proceedings for aliens under deportation orders if they were in custody. *See* 8 U.S.C. § 1105a(a)(10) (1994).

The circuits split over how to resolve the apparent conflict between the exclusive remedy language of § 1105a(a) and the right of habeas corpus that remained under § 1105a(a)(10). The Second, Eighth, and Tenth Circuits held that habeas review under subsection (a)(10) only covered a narrow range of issues outside the scope of direct review under subsection (a). *See Garay v. Slattery,* 23 F.3d 744, 745–46 (2d Cir.1994); *Daneshvar v. Chauvin,* 644 F.2d 1248, 1251 (8th Cir.1981) (limiting habeas review to denials of discretionary relief where deportability itself is not an issue); *Galaviz–Medina v. Wooten,* 27 F.3d 487, 494 (10th Cir.1994) (holding that alien may make due process claims in habeas corpus proceedings but cannot challenge merits of deportation order).[12] The Fifth Circuit, however, held that the scope of review was the same in both habeas corpus proceedings and direct review. *See Marcello v. District Director, INS,* 634 F.2d 964, 972 (5th Cir.1981). The court explained that although Congress desired to streamline deportation proceedings and reduce delays by providing for direct review in the courts of appeals, the Suspension Clause stood in the way of entirely eliminating the writ of habeas corpus in immigration proceedings. *Id.* at 966–67. Accordingly, Congress preserved the writ for aliens held in custody, and, to meet the problem of repetitive proceedings, provided that an alien generally could not employ both methods of review successively.[13]

After the enactment of INA section 106 the writ of habeas corpus under 28 U.S.C. § 2241 remained an alternate basis for federal court jurisdiction to INS sections

**10.** Even before deciding *Pedreiro* the Court had affirmed, on a 4–4 vote and without opinion, a decision by the D.C. Circuit that held that the 1952 INA permitted an alien to seek declaratory and injunctive relief under the APA and distinguished *Heikkila* by an analysis similar to *Pedreiro's. See Rubinstein v. Brownell,* 206 F.2d 449 (D.C.Cir.1953), *aff'd by an equally divided court,* 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954).

**11.** The Hobbs Act, 28 U.S.C. §§ 2341–51 (1996), governs review procedures in the courts of appeals for several different agencies and operates in tandem with the standards of review in the APA. *See id.* § 2342; *INS v. Doherty,* 502 U.S. 314, 112 S.Ct. 719, 728 n. 1, 116 L.Ed.2d 823

(1992) (Scalia, J., concurring in the judgment in part and dissenting in part).

**12.** *Daneshvar* refers to subsection (a)(9), the former location of the present subsection (a)(10).

**13.** *See id.* at 968–69; 8 U.S.C. § 1105a(c) (1994) ("No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceeding, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the order.").

106(a)(10) and 106(b). This can be seen in *Marcello*, where the petitioner sought relief under § 2241, *see* 634 F.2d at 971, and in scattered deportation cases that found jurisdiction either solely under § 2241 or under both § 2241 and 8 U.S.C. § 1105a(a)(10). *See Orozco v. INS*, 911 F.2d 539, 541 (11th Cir.1990) ("Challenges to deportation proceedings are cognizable under 28 U.S.C. § 2241."); *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1390 (10th Cir.1981); *Mondragon v. Ilchert*, 653 F.2d 1254, 1255 (9th Cir.1980) ("The district court had jurisdiction to review the deportation order under 8 U.S.C. § 1105a(a)(9) and 28 U.S.C. § 2241."). Most cases mention only INA sections 106(a)(10) or (b), but, as one court explained, this is not surprising: "On occasions where habeas actions were brought, there was no reason for reviewing courts to focus specifically on whether section 2241 or section 106(a)(10) of the INA was the proper basis for jurisdiction. Nothing turned on the distinction." *Mojica v. Reno*, 970 F.Supp. 130, 162 (E.D.N.Y.1997).

### D.

The AEDPA made significant modifications to INA section 106. Section 401(e) of the AEDPA, captioned "Elimination of Custody Review by Habeas Corpus," eliminated subsection (a)(10) of INA section 106, former 8 U.S.C. § 1105a(a)(10). *See* AEDPA § 401(e), 110 Stat. 1268. Section 440(a) added a new subsection·(a)(10):

> Any final order of deportation against an alien who is deportable by reason of having committed [certain drug and other criminal offenses] shall not be subject to review by any court.

AEDPA § 440(a), 110 Stat. 1276–77. Exclusion orders are not mentioned in the AEDPA. The Fifth Circuit has held that section 440(a) became effective on April 24, 1996, the date the President signed the AEDPA into law, and that it applies retroactively to cases that were pending when the AEDPA was enacted. *See Mendez–Rosas v. INS*, 87 F.3d 672, 676 (5th Cir.1996).

Every circuit court that has construed section 440(a) has held that it· eliminates direct appellate review under INA section 106(a) of deportation orders for the defined class of criminal aliens. *See, e.g., Williams v. INS*, 114 F.3d 82, 83 (5th Cir.1997); *Yang v. INS*, 109 F.3d 1185, 1194–97 (7th Cir.1997); *Boston–Bollers v. INS*, 106 F.3d 352, 355 (11th Cir.1997); *Kolster v. INS*, 101 F.3d 785, 790–91 (1st Cir.1996); *Salazar–Haro v. INS*, 95 F.3d 309, 311 (3d Cir.1996); *Hincapie–Nieto v. INS*, 92 F.3d 27, 30–31 (2d Cir.1996); *Qasguargis v. INS*, 91 F.3d 788, 789–90 (6th Cir.1996); *Duldulao v. INS*, 90 F.3d 396, 399–400 (9th Cir.1996). Most of these courts, however, have concluded that criminal deportees retain some opportunity to seek judicial relief, generally because of concerns that cutting off all judicial review would violate the Suspension Clause or the Due Process Clause. *See Williams*, 114 F.3d at 84 (holding that at minimum aliens can still seek the writ preserved by the Suspension Clause); *Yang*, 109 F.3d at 1195 ("Aliens may seek the writ that Art. I § 9 cl. 2 preserves against suspension."); *Salazar–Haro*, 95 F.3d at 311 ("To the extent, therefore, that [Fifth Amendment] rights applicable to aliens may be at stake, judicial review may not be withdrawn by statute."); *Hincapie–Nieto*, 92 F.3d at 31 (concluding that section 440(a)'s repeal of direct review is constitutional on the basis of representations by the INS that some avenue of judicial relief remains available for core constitutional concerns); *Kolster*, 101 F.3d at 791 (same). *Cf. Duldulao*, 90 F.3d at 400 n. 4 (upholding section 440(a)'s elimination of direct appeals but noting that the availability of habeas relief was not an issue); *Boston–Bollers*, 106 F.3d at 354–55 (upholding constitutionality of section 440(a) without mentioning issue of remaining habeas relief). Numerous district courts have held that section 440(a) did not repeal habeas jurisdiction under 28 U.S.C. § 2241 to review deportation orders.

### E.

On September 30, 1996, only a few months after the AEDPA took effect, Congress enacted the IIRIRA, which replaced exclusion and deportation with the new removal pro-

ceedings.[14] Section 306 of the IIRIRA repealed INA section 106 and replaced it with a new provision governing judicial review of removal proceedings, INA section 242, 8 U.S.C. § 1252.[15] *See* IIRIRA § 306, 110 Stat. 3009–607–12. Under new INA section 242 the standard method of judicial review continues to be direct review in the courts of appeal under the Hobbs Act. Section 242(e)(2) preserves habeas corpus proceedings, but only to determine (1) whether the petitioner is an alien, (2) whether the petitioner was ordered removed, (3) whether the petitioner can prove he has been lawfully admitted for permanent residence, and (4) certain other issues concerning asylum and refugee status. As in section 440(a) of the AEDPA, Congress provided that no court has jurisdiction to review removal orders for a broad class of criminal aliens. *See* INA § 242(a)(2)(C), 8 U.S.C. § 1252(a)(2)(C). In addition, no court has jurisdiction to review any decision specified by the INA to be within the discretion of the Attorney General, except for decisions concerning asylum. *See* INA § 242(a)(2)(B), 8 U.S.C. § 1252(a)(2)(B).

Congress provided that new section 242 is the exclusive authority for judicial review of removal proceedings:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this chapter shall be available only in judicial review of a final order under this section.

INA § 242(a)(9), 8 U.S.C. § 1252(a)(9). Congress reiterated the exclusiveness in section 242(g):

> Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien

arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

INA § 242(g), 8 U.S.C. § 1252(g).

In addition to these permanent provisions, the IIRIRA provides transitional rules for judicial review of exclusion and deportation orders in pending cases. *See* IIRIRA § 309(c)(1) & (4), 110 Stat. 3009–626. The standard method of review under the transitional rules is review in the appellate courts under the old INA section 106, as amended by the AEDPA. *See id.* The transitional rules, however, overlay INA section 106 with many of the important features of the new INA section 242. *Compare* IIRIRA § 309(c)(4)(E) (prohibiting appeal of discretionary decisions) *with* INA § 242, 8 U.S.C. § 1252(a)(2)(B) (same); *and* IIRIRA § 309(c)(4)(G) (prohibiting appeals by certain criminal aliens) *with* INA § 242, 8 U.S.C. § 1252(a)(2)(C) (same). Before considering the effect of the AEDPA and IIRIRA on Sabino's attempt to seek review of his exclusion order under 28 U.S.C. § 2241, the court must determine when the various provisions of the IIRIRA become effective.

### IV.

██ Much confusion has arisen over the effective date of new INA section 242 and its interaction with the IIRIRA's transitional rules. Section 309(a) of the IIRIRA provides that the effective date of the IIRIRA is April 1, 1997, with certain exceptions.[16] Section 306(c) of the IIRIRA addresses the effective date of the new INA section 242 and purports to make the new section 242(g) retroactive. Section 306(c)(1) states:

> [T]he amendments made by subsections (a) and (b) [which repeal INA section 106 and replace it with INA section 242] *shall apply as provided under section 309*, except

---

14. *See supra* section I.

15. The old 8 U.S.C. § 1252 (1994) governed hearing procedures in deportation proceedings.

16. Section 309(a) states:
Except as provided in this section and sections 303(b)(2), 306(c), 308(d)(2)(D), or 308(d)(5) of this division, this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act (in this title referred to as the "title III–A effective date").
IIRIRA § 309(a), 110 Stat. 3009–625. Since the IIRIRA was enacted on September 30, 1996, the "title III–A effective date" is April 1, 1997.

that subsection (g) of section 242 of the Immigration and Nationality Act (as added by subsection (a)) shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act.

IIRIRA § 306(c)(1), 110 Stat. 3009–612, as amended by Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657 (emphasis added).[17] Putting aside for the moment the effect of the retroactive language of the second part of section 306(c)(1), the court will first consider the effect of section 309.

In addition to the general effective date of April 1, 1997, provided by section 309(a), section 309(c) contains several provisions governing pending cases. The amendments to the INA that create the new removal proceedings, including the judicial review provisions of new section 242, do not apply to exclusion and deportation cases pending before April 1, 1997. *See* IIRIRA § 309(c)(1)(A), 110 Stat. 3009–625, as amended by Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657. In such pending cases, "the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments." *See* IIRIRA § 309(c)(1)(B), 110 Stat. 3009–625, as amended by Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657.[18] The special transitional rules apply to orders of exclusion and deportation that become final after October 31, 1996. *See* IIRIRA § 309(c)(4), 110 Stat. 3009–626, as amended by Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657 (stating that transitional rules apply "[i]n the case in which a final order of exclusion or deportation is entered more than 30 days after the date of the enactment of this Act").

Thus, according to IIRIRA sections 309(c)(1) and 309(c)(4), judicial review of ex-clusion and deportation proceedings pending before April 1, 1997, is governed by INA section 106, as amended by the AEDPA. But if the final order of exclusion or deportation is entered after October 31, 1996, review under section 106 is modified by the transitional rules. Because Sabino's exclusion proceeding began in 1992 and was thus pending before April 1, 1997, and his order of exclusion became final on August 27, 1997, both INA section 106 and the transitional rules govern judicial review in this case.[19] The problem with this fairly straightforward result is that the retroactive language in the second part of section 306(c)(1) appears to require the immediate application of new section 242(g).

A number of district courts, relying on the retroactive language in the second part of section 306(c)(1), have applied new INA section 242(g) to cases that were pending before April 1, 1997. *See, e.g., Gutierrez–Martinez v. Reno,* 989 F.Supp. 1205 (N.D.Ga.1998); *Zadvydas v. Caplinger,* 986 F.Supp. 1011 (E.D.La.1997); *United States ex rel. Morgan v. McElroy,* 981 F.Supp. 873 (S.D.N.Y.1997); *Ozoanya v. Reno,* 979 F.Supp. 447 (W.D.La. 1997); *Jurado–Gutierrez v. Greene,* 977 F.Supp. 1089 (D.Colo.1997); *Safarian v. Reno,* 968 F.Supp. 1101 (E.D.La.1997); *Benziane v. United States,* 960 F.Supp. 238 (D.Colo.1997). None of these cases, however, mention the transitional rules.

The Fifth Circuit, although not expressly acknowledging the conflict between the transitional rules and section 306(c)(1), has applied the transitional rules to deportation cases that were pending before April 1, 1997. *See Eyoum v. INS,* 125 F.3d 889 (5th Cir. 1997); *Nguyen v. INS,* 117 F.3d 206 (5th Cir.1997); *Ibrik v. INS,* 108 F.3d 596 (5th Cir.1997) (per curiam). A number of other

---

**17.** Before it was amended on October 11, 1996, section 306(c)(1) made new INA section 242 applicable to all final orders of deportation or removal filed on or after September 30, 1996. In its amended form, however, section 306(c)(1) incorporates the effective date provisions of section 309.

**18.** Section 309(c) also authorizes the Attorney General to (1) proceed under the new removal proceedings if no evidentiary hearing has been held and the alien is given thirty days' notice, or

(2) terminate pending exclusion or deportation proceedings and start over with removal proceedings, so long as no final administrative decision has been made. *See* IIRIRA § 309(c)(2)–(3), 110 Stat. 3009–626. Neither election has been made in this case.

**19.** An order of deportation or exclusion becomes final upon dismissal of an appeal by the Board of Immigration Appeals. *See* 8 C.F.R. § 243.1.

circuit courts have also applied the transitional rules to deportation cases pending before April 1, 1997. *See Hadera v. INS,* 136 F.3d 1338, 1340 (D.C.Cir.1998); *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997); *Pilch v. INS,* 129 F.3d 969, 970 (7th Cir. 1997); *Mayard v. INS,* 129 F.3d 438, 439 (8th Cir.1997) (per curiam); *Berehe v. INS,* 114 F.3d 159, 161 (10th Cir.1997). This court likewise concludes that the transitional rules apply in this case.

Because Sabino's order of exclusion became final on August 27, 1997, which is after the April 1, 1997, general effective date of the IIRIRA, another wrinkle is present in this case. In *Hose v. INS,* 1998 WL 196260 (9th Cir.1998), the court applied INA section 242(g) to an exclusion order that became final on April 25, 1997, even though the proceedings began before April 1, 1997. In *Kalaw v. INS,* 133 F.3d 1147 (9th Cir.1997), the same court held that the transitional rules applied to an order that was "filed in the transition window between October 30, 1996 and April 1, 1997." *Id.* at 1150.

The Ninth Circuit's "window" concept has no support in the IIRIRA. Section 309(c)(1) declares that INA section 242 does not apply to cases pending before April 1, 1997, and that judicial review in such cases shall be conducted without regard to the IIRIRA's amendments. Section 309(c)(4) declares that the transitional rules apply to final orders of exclusion or deportation entered after October 31, 1996—without saying anything about an April 1, 1997, cut-off date. The court in *Hose* did not discuss section 309(c). The court in *Kalaw* mentioned section 309(c)(4) but not section 309(c)(1). Although the "window" concept gives some retroactive effect to section 242, it is not the retroactive effect envisioned by the language in the second part of section 306(c)(1), which purports to apply section 242(g) to all past and pending cases—not just those in which a final order is entered after April 1, 1997.

The court in *Hose* relied on *Auguste v. Attorney General,* 118 F.3d 723 (11th Cir.

1997), among other cases. In *Auguste* the Eleventh Circuit held that "since April 1, 1997, no court has had jurisdiction to review Auguste's deportation order, except as provided by newly amended 8 U.S.C. § 1252." *Id.* at 725. On a petition for rehearing, however, the Eleventh Circuit modified this holding after the petitioner brought section 309(c)(1) to its attention. *See Auguste v. Reno,* 140 F.3d 1373 (11th Cir.1998). The court held that it retained jurisdiction for aliens whose proceedings were pending before April 1, 1997.[20]

The Fifth Circuit stated in *Ibrik* that IIRIRA section 309(c)(4)(C) "creates an exception to section 309(c)(1) for appeals from final orders of exclusion or deportation entered between October 31, 1996 and April 1, 1997." *See Ibrik,* 108 F.3d at 597. Although this statement could be read as endorsing the "window" concept, the order in *Ibrik* became final well before the supposed cut-off date of April 1, 1997. In two later cases the Fifth Circuit implicitly rejected the "window" concept by applying the transitional rules to orders that became final after April 1, 1997. *Seede Garcia v. INS,* 141 F.3d 215 (5th Cir. 1998) (deportation order became final on April 29, 1997); *Nguyen v. INS,* 117 F.3d 206 (5th Cir.1997) (deportation order became final on May 19, 1997). At least one other circuit court has also applied the transitional rules to an order that became final after April 1, 1997. *Meguenine v. INS,* 139 F.3d 25, 26 (1st Cir.1998) (deportation, order became final on August 7, 1997). This court concludes that the "window" concept is incorrect and that to the extent *Ibrik* suggests that orders that become final after April 1, 1997, are governed by section 242(g) instead of the transitional rules, such language is *dicta* and is inconsistent with the holdings in *de Garcia* and *Nguyen.*

*de Garcia* and *Nguyen* do not discuss when new INA section 242 becomes effective. The first part of section 306(c)(1) states that section 242 "shall apply as provided under section 309." The effect of section 309(a) is

---

**20.** Both *Hose* and the first opinion in *Auguste* relied on *INS v. Yang,* 519 U.S. 26, 117 S.Ct. 350, 136 L.Ed.2d 288 (1996), which stated in a footnote that INA section 242(g) was inapplicable

because it "does not take effect ... until April 1, 1997." *Yang,* 117 S.Ct. at 352 n. 1. But there is no indication that the transitional rules or section 309(c)(1) were at issue in *Yang.*

to require the Attorney General to use removal proceedings (as opposed to deportation or exclusion proceedings) for cases that begin after April 1, 1997. Thus, a logical way of harmonizing these provisions is to conclude that section 242 *takes effect* on April 1, 1997, but only applies to removal proceedings—not, according to section 309(c)(1), to exclusion or deportation proceedings pending before that date. This interpretation, however, conflicts with the second part of section 306(c)(1), which purports to apply new INA section 242(g) to *all* past and pending exclusion and deportation cases. Section 242(g) bars all judicial review except that provided in section 242. The literal language of the second part of section 306(c)(1) thus appears not only to contradict section 309(c)(1) but to make the transitional rules a nullity. If new INA section 242 is the only possible method of review for all past and pending cases, the transitional rules cannot apply to those cases. There does not appear to be any interpretation of the second part of section 306(c)(1) that is consistent with sections 309(c)(1) and 309(c)(4). Nevertheless, in order to be consistent with the Fifth Circuit's application of the transitional rules in de *Garcia* and *Nguyen,* the court cannot read the language of the last part of section 306(c)(1) as making section 242(g) retroactive in this case.

## V.

The transitional rule governing exclusion orders is IIRIRA section 309(c)(4)(A), 110 Stat. 3009–626, which states:

> [I]n the case of judicial review of a final order of exclusion, subsection (b) of [INA section 106] shall not apply and the action for judicial review shall be governed by the provisions of subsections (a) and (c) of [INA section 106] in the same manner as

they apply to judicial review of orders of deportation.

The court must decide what, if any, habeas jurisdiction it retains under the transitional rule to review exclusion orders. Previously, the court had such jurisdiction under both INA section 106(b) and 28 U.S.C. § 2241.[21] In answering this question the court is guided by *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), and *ex parte Yerger,* 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868), which discuss attempts by Congress to narrow the Supreme Court's jurisdiction to review habeas petitions.

### A.

In *Yerger* a private citizen of Mississippi was being tried for murder by a United States military commission established under a congressional act providing "for the more efficient government of the rebel States"[22] without a jury and without having been indicted by a grand jury. He petitioned the circuit court for the southern district of Mississippi for a writ of habeas corpus. The court determined that his custody was lawful and dismissed the writ. The petitioner then sought writs of habeas corpus and certiorari from the Supreme Court. The Supreme Court had possessed the power to grant original writs of habeas corpus since the Judiciary Act of 1789. *Yerger,* 75 U.S. (8 Wall.) at 96.[23] In the Act of February 5, 1867, Congress authorized direct appeals of habeas decisions from district courts to circuit courts and from circuit courts to the Supreme Court. *See Yerger,* 75 U.S. (8 Wall.) at 87, 104. A year later, however, Congress passed the Act of March 27, 1868, which provided

> that *so much* of the act approved February 5th, 1867, as *authorizes* an appeal from the judgment of the Circuit Court to the Su-

---

21. *See supra* section III.C.

22. *Yerger,* 75 U.S. (8 Wall.) at 88.

23. *See supra* section III.A. for text of 1789 Act. The power to grant original writs of habeas corpus is not part of the original jurisdiction of the Supreme Court. *See Ex parte Bollman,* 8 U.S. (4 Cranch) 75, 100, 2 L.Ed. 554 (1807). The Constitution's description of the Court's original jurisdiction does not include the power to grant writs of habeas corpus, and Congress cannot

enlarge that jurisdiction. *See id.; Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). According to Chief Justice Marshall, however, the writ of habeas corpus is "appellate in its nature" because the decision that an individual shall be imprisoned must precede the application for writ of habeas corpus, and the writ is always for the purpose of revising that decision. *ex parte Bollman,* 8 U.S. (4 Cranch) at 100. Thus, the writ belongs to the Court's appellate jurisdiction, which Congress can increase.

preme Court of the United States, or the exercise of any such jurisdiction by said Supreme Court on appeals which have been, or may be hereafter taken, be, and the same is hereby repealed.

*Yerger,* 75 U.S. (8 Wall.) at 105 (emphasis by Court). A case considered earlier in the same term as *Yerger, ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1868), had reached the Supreme Court by direct appeal under the 1867 Act.[24] In *McCardle* the Court held that the 1868 Act stripped its authority to hear a direct appeal of a habeas decision and dismissed the case for want of jurisdiction.[25] *Id.* at 514; *see also Yerger,* 75 U.S. (8 Wall.) at 104. In *Yerger,* however, the Court held that the 1868 Act did not repeal the Court's authority to grant original writs of habeas corpus under the Judiciary Act of 1789: "These words [of the 1868 Act] are not of doubtful interpretation. They repeal only so much of the act of 1867 as authorized appeals, or the exercise of appellate jurisdiction by this court. They affected only appeals and appellate jurisdiction authorized by that act." *Id.* at 105. The Court also rejected the argument that the 1867 Act had repealed the habeas corpus provision in the Judiciary Act of 1789 and other prior acts and thereby become the sole source of habeas corpus jurisdiction. The Court stated:

> We have already observed that there are no repealing words in the act of 1867. If it repealed the act of 1789, it did so by implication . . . .
>
> Repeals by implication are not favored. They are seldom admitted except on the ground of repugnancy; and never, we think, when the former act can stand together with the new act.

*Yerger,* 75 U.S. (8 Wall.) at 105.

More than 100 years later, in *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), the Supreme Court considered a jurisdiction-limiting provision of the AEDPA that was similar to the 1868 Act

considered in *Yerger.* In the AEDPA Congress set up a gate keeping mechanism to control the submission of successive applications for habeas review of state court convictions under 28 U.S.C. § 2254. *See Felker,* 116 S.Ct. at 2336–37. A prospective habeas applicant must file a motion for leave in the court of appeals and make a prima facie showing on the requirements for relief on a second or successive habeas application. *See* 28 U.S.C. § 2244(b)(2)-(3). Congress provided that the decision of the court of appeals to grant or deny such motion "shall not be *appealable* and shall not be the subject of a petition for rehearing or for writ of *certiorari.*" *Id.* § 2244(b)(3)(E) (emphasis added). Relying on *Yerger,* a unanimous Court held that this statute did not repeal its power to hear original habeas petitions filed under 28 U.S.C. § 2241—the direct descendant of the 1789 Act that provided jurisdiction in *Yerger. See Felker,* 116 S.Ct. at 2338–39 & n. 1.

**B.**

■ Section 106(b) of the INA, 8 U.S.C. § 1105a(b) (1994) states that "any alien against whom a final order of exclusion has been made . . . may obtain judicial review of such order by habeas corpus proceedings and not otherwise." By providing in IIRIRA section 309(c)(4)(A)[26] that section 106(b) "shall not apply," Congress eliminated the source of habeas jurisdiction customarily used in exclusion proceedings after 1961. But even after INA section 106 was enacted, the traditional statutory writ of habeas corpus under 28 U.S.C. § 2241 continued to provide jurisdiction for district court review of deportation and exclusion proceedings, as it had since the late 1800's. Just as Congress's enactment of the 1867 Habeas Corpus Act did not repeal the Judiciary Act of 1789 by implication, *see Yerger,* 75 U.S. (8 Wall.) at 105, Congress's enactment of INA section 106 in 1961 did not repeal jurisdiction to review exclusion orders under 28 U.S.C. § 2241 by implication. *See Orozco,* 911 F.2d

---

**24.** *See McCardle,* 74 U.S. (7 Wall.) at 507. Like *Yerger, McCardle* came out of the circuit court for the southern district of Mississippi and alleged unlawful restraint by military force. *McCardle,* 74 U.S. (7 Wall.) at 507.

**25.** Congress passed the 1868 Act while *McCardle* was pending in the Supreme Court, after the first round of oral arguments. *See Yerger,* 75 U.S. (8 Wall.) at 104.

**26.** *See supra* page 634 for full text of the rule.

at 541.[27] And just as Congress did not eliminate the Supreme Court's habeas jurisdiction by prohibiting direct appeals and writs of certiorari in 28 U.S.C. § 2244(b)(3)(E), *see Felker*, 116 S.Ct. at 2338–39, the elimination of INA section 106(b) does not repeal this court's jurisdiction to review exclusion orders under § 2241. *See also Yerger*, 75 U.S. (8 Wall.) at 105.

IIRIRA section 309(c)(4)(A) also states, however, that judicial review of exclusion orders shall be governed by the provisions of subsections (a) and (c) of INA section 106 "in the same manner as they apply to judicial review of orders of deportation."[28] As a result of AEDPA sections 401(e) and 440(a), INA section 106(a)(10) now states that deportation orders of drug offenders "shall not be subject to review by any court." The court must therefore decide whether IIRIRA section 309(c)(4)(A)'s command to treat exclusion orders like deportation orders constitutes a repeal of § 2241 jurisdiction over exclusion orders that satisfies the standards of *Yerger* and *Felker*. To answer this question the court must first consider the effect of the AEDPA amendments on the review of deportation orders.

Before the AEDPA an alien could seek review of a deportation order in the courts of appeals under INA section 106(a), or, if he was in custody, through a writ of habeas corpus in the district court under INA section 106(a)(10). The AEDPA struck subsection (a)(10). Under *Yerger* and *Felker*, however, the mere striking of subsection (a)(10) could not eliminate jurisdiction under § 2241.[29] The AEDPA also added a new subsection (a)(10), which stated:

> Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(I), *shall not be subject to review by any court.*

AEDPA § 440(a), 110 Stat. 1276, as amended by IIRIRA § 306(d), 110 Stat. 3009–612 (emphasis added). Several circuits have held that AEDPA section 440(a) abolishes direct appeals of deportation orders for the defined class of aliens, but many of these courts have held that some avenue for judicial relief nevertheless remains. *See, e.g., Williams*, 114 F.3d at 84.[30]

Almost every district court to construe section 440(a) has held that it does not repeal the jurisdiction in § 2241 to review deportation orders. *See Cruz v. Reno*, 6 F.Supp.2d 744 (N.D.Ill.1998); *Billett v. Reno*, 2 F.Supp.2d 368 (W.D.N.Y.1998); *Barrett v. INS*, 997 F.Supp. 896 (N.D.Ohio 1998); *Gutierrez–Martinez v. Reno*, 989 F.Supp. 1205 (N.D.Ga.1998); *Morisath v. Smith*, 988 F.Supp. 1333 (W.D.Wash.1997); *Ozoanya v. Reno*, 979 F.Supp. 447 (W.D.La.1997); *Jurado–Gutierrez v. Greene*, 977 F.Supp. 1089 (D.Colo.1997); *Thomas v. INS*, 975 F.Supp. 840 (W.D.La.1997); *Ozoanya v. Reno*, 968 F.Supp. 1 (D.D.C.1997); *Vargas v. Reno*, 966 F.Supp. 1537 (S.D.Cal.1997); *Sanchez v. District Director, Immigration & Naturaliza-*

---

27. *See also supra* section III.C.

28. Although aliens under exclusion orders can now seek direct appellate review, the transitional rule in section 309(c)(4)(E) prohibits an "appeal" of a discretionary decision under 8 U.S.C. § 1182(c), which is the subject of Sabino's habeas corpus application. Another transitional rule prohibits an "appeal" in the case of an alien who is "inadmissible" by reason of having committed a criminal offense in 8 U.S.C. § 1182(a)(2), which includes drug offenses. IIRIRA § 309(c)(4)(G), 110 Stat. 3009–626. These sections do not apply to applications for writs of habeas corpus in the district court. The "appeal" is initiated by a "petition for review," which must be filed in the courts of appeals. *See* IIRIRA § 309(c)(4)(D); 110 Stat. 3009–626; INA

§ 106, 8 U.S.C. § 1105a(a)(1). Subsections (c)(4)(B) through (c)(4)(G) of section 309 apply only to review in the courts of appeals. *See Goncalves v. Reno*, 144 F.3d 110, 120 (1st Cir. 1998). Therefore, the INS is incorrect in arguing that even if this court has habeas jurisdiction, section 309(c)(4)(C) required Sabino to file his habeas petition in the district court within thirty days after the date of his final order of exclusion.

29. Nor does the caption to section 401(e) of the AEDPA, "Elimination of Custody Review," constitute a repeal of habeas jurisdiction under 28 U.S.C. § 2241. *See Yesil v. Reno*, 958 F.Supp. 828, 838 (S.D.N.Y.1997).

30. *See also supra* section III.D.

*tion Service,* 962 F.Supp. 1210 (D.Neb.1996); *Duldulao v. Reno,* 958 F.Supp. 476 (D.Hawai'i 1997); *Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y.1997); *In Matter of Castellanos,* 955 F.Supp. 96 (W.D.Wash.1996); *Eltayeb v. Ingham,* 950 F.Supp. 95 (S.D.N.Y.1997); *Powell v. Jennifer,* 937 F.Supp. 1245 (E.D.Mich.1996); *Mbiya v. INS,* 930 F.Supp. 609 (N.D.Ga.1996). The court has found only two published cases that take the opposite view. *Mayers v. Reno,* 977 F.Supp. 1457 (S.D.Fla.1997); *Moore v. District Director, INS,* 956 F.Supp. 878 (D.Neb.1997) (holding that the AEDPA and IIRIRA repealed all statutory jurisdiction but that the Constitution requires that some jurisdiction remain).

If the court were to adopt the majority view that jurisdiction under § 2241 to review deportation orders survives AEDPA section 440(a), the necessary conclusion would be that section 440(a) does not repeal § 2241 jurisdiction over exclusion orders. But those cases involve issues that the court need not reach. The phrase "shall not be subject to review by any court" applies directly to deportation orders, raising questions of what level of judicial review in deportation proceedings is required by the Constitution.

*See, e.g., Mbiya,* 930 F.Supp. at 612; *Yesil,* 958 F.Supp. at 839. *See also Williams,* 114 F.3d at 82.[31]

Exclusion orders, unlike deportation orders, are not directly affected by section 440(a). Its prohibition on "review by any court" applies to "any final order of *deportation* against an alien who is *deportable* by reason of having committed a criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(I)." AEDPA § 440(a), 110 Stat. 1276 (emphasis added). This language, even when viewed in light of IIRIRA section 309(c)(4)(A)'s command that orders of exclusion be treated like orders of deportation, applies only to aliens who are found deportable under the enumerated subsections of INA section 241 (now codified at 8 U.S.C. § 1227) in deportation proceedings. AEDPA section 440(a) does not reach aliens found excludable under the provisions of 8 U.S.C. § 1182.[32] A fair reading of the interplay among IIRIRA section 309(c)(4)(A), INA sec-

**31.** These cases also raise the issue of how to apply *Yerger* and *Felker,* both of which construed narrowly phrased statutes, to a broad, categorical prohibition on judicial review. *See Yesil,* 958 F.Supp. at 838; *Gutierrez–Martinez,* 989 F.Supp. at 1209; *Morisath,* 988 F.Supp. at 1339. The statute at issue in *Felker* applies by its terms only to appeals and petitions for certiorari. *See Felker,* 116 S.Ct. at 2337 & 2339. The 1868 Act in *Yerger* applied narrowly to direct appeals authorized by the 1867 Act. *See Yerger,* 75 U.S. (8 Wall.) at 105. Both statues are similar to AEDPA section 401(e), which simply strikes the old INA section 106(a)(10), and to IIRIRA section 309(c)(4)(A), which states that INA section 106(b) "shall not apply." Section 440(a) of the AEDPA, however, states that the defined class of deportation orders "shall not be subject to review by any court." This is similar to the new INA section 242(g), which states, "Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien ...." INA § 242, 8 U.S.C. § 1252(g). The First Circuit has held that section 242(g) does not repeal jurisdiction under § 2241, relying on *Yerger* and *Felker* as well as the desire to avoid constitutional issues. *See Goncalves v. Reno,* 144 F.3d 110 (1st Cir.1998). Other courts, however, have held that section 242(g) removes all jurisdiction to review deportation orders. *See, e.g.,*

*Benziane v. United States,* 960 F.Supp. 238 (D.Colo.1997).

**32.** The argument could be made that Sabino would have been "deportable" under INA section 241, 8 U.S.C. § 1251(a)(2)(B)(I) (1994), which provides for deportation of "any alien who ... has been convicted of a violation of ... any law or regulation of a State, the United States, or a foreign country relating to controlled substances...." Such an argument, however, illustrates the differences between deportation and exclusion proceedings. The provision under which Sabino was found excludable, 8 U.S.C. § 1182(a)(2)(A)(I)(II) (1994), applies not only to an alien who is *convicted* of violating foreign drug laws, but also to an alien "who admits committing acts which constitute the essential elements of" a violation of foreign drug laws. The latter ground is not a ground of deportation in 8 U.S.C. § 1251(a)(2)(B)(I) (1994). The immigration judge found Sabino excludable precisely because he "admitted committing acts which constituted the essential elements of a violation of Japanese law"; he did not find that Sabino was excludable for having been convicted under foreign drug laws. *In re Sabino,* January 27, 1993, Oral Decision of Immigration Judge at page 2, Exhibit 10 in support of Respondents' Answer and Return (Docket Entry No. 10).

tion 106(a), and AEDPA sections 401(e) and 440(a) in light of the Supreme Court's holdings in *Yerger* and *Felker*, persuades the court that these provisions do not repeal habeas jurisdiction under § 2241 to review Sabino's exclusion order.

### C.

■ The last jurisdictional issue is whether Sabino is "in custody" for purposes of § 2241. Sabino has been paroled into the United States during his exclusion proceedings. In *Marcello* the Fifth Circuit held that an alien on supervised parole satisfied the custody requirement of § 2241. *See* 634 F.2d at 971 & n. 11. The INS does not dispute this issue. Accordingly, the court concludes that Sabino is in custody and that jurisdiction to review Sabino's application for writ of habeas corpus is proper under § 2241.

### VI.

Having concluded that Sabino's exclusion order is reviewable under 28 U.S.C. § 2241, the court must determine the scope of review of exclusion orders under § 2241.

### A.

■ Most of the courts holding that AEDPA section 440(a) did not repeal jurisdiction under § 2241 to review *deportation* orders have concluded that the scope of review is limited to claims of a "fundamental miscarriage of justice," or substantial or grave constitutional errors. *See Gutierrez–Martinez*, 989 F.Supp. at 1209; *Morisath*, 988 F.Supp. at 1339; *Thomas*, 975 F.Supp. at 849; *Sanchez*, 962 F.Supp. at 1213; *Duldulao*, 958 F.Supp. at 479; *In re Castellanos*, 955 F.Supp. at 97; *Eltayeb*, 950 F.Supp. at 100; *Powell*, 937 F.Supp. at 1252; *Mbiya*, 930 F.Supp. at 612. *But see Yesil*, 958 F.Supp. at 839 (declining to decide whether scope of review is limited to constitutional claims).

The first case in this line, *Mbiya*, observed that section 440(a) "could conceivably run afoul of the Suspension Clause" if it were construed to preclude all judicial review. 930 F.Supp. at 612. The court proceeded to hold that section 440(a) did not repeal jurisdiction

under § 2241, but it concluded that Congress intended to narrow the scope of review:

> [T]he provisions of the AEDPA make clear that Congress desired to expedite the deportation of criminal aliens and to restrict all judicial review of final orders to the greatest extent possible.... [T]he newly amended § 1105a(a)(10) strongly suggests that Congress intended to preserve the writ of habeas corpus under § 2241 in these cases only to the extent required by the Constitution.

*Mbiya* at 612. Accordingly, the court held that the scope of review under § 2241 was limited to claims of a "fundamental miscarriage of justice." The court cited no authority for this standard, explaining only that "[t]his accommodation preserves the balance between the Suspension Clause and Congress's plenary authority to control immigration." *Id.* Most of the cases following *Mbiya* either adopted the fundamental miscarriage of justice standard or relied on its reasoning to avoid potential conflicts with the Suspension Clause, the Due Process Clause, or other constitutional problems. *See, e.g., Gutierrez–Martinez*, 989 F.Supp. at 1209; *Vargas*, 966 F.Supp. at 1541; *Morisath*, 988 F.Supp. at 1338.

*Mbiya* and the cases following it rely either directly or indirectly on the canon that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." *Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 1790, 6 L.Ed.2d 1141 (1961). In *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3251, 92 L.Ed.2d 675 (1986), however, the Supreme Court held that courts cannot judicially rewrite a statute in order to avoid constitutional adjudication. The court in *Mbiya* may have crossed that line. Section 440(a) flatly states that the defined class of deportation orders "shall not be subject to review by any court." It is difficult to glean from this language an intent "to preserve the writ of habeas corpus under § 2241 in these cases only to the extent required by Constitution." *Mbiya*, 930 F.Supp. at 612. And even if section 440(a) could be read to express such an intent, *Mbiya* cites no authority for its conclusion that the Constitution requires ju-

dicial review only for claims of a fundamental miscarriage of justice. *Cf. Goncalves v. Reno*, 144 F.3d 110, 124 (1st Cir.1998) (refusing to import fundamental miscarriage of justice standard from state prisoner post-conviction relief cases into cases brought under the traditional statutory writ of habeas corpus to review executive detention); *Mojica v. Reno*, 970 F.Supp. 130, 163 (E.D.N.Y. 1997) (rejecting *Mbiya*'s "accommodation" of Congress's general policy goals based on "suggestions" of congressional intent). The court concludes that section 440(a) does not narrow the scope of review under § 2241 to claims of a fundamental miscarriage of justice or substantial constitutional error.[33]

## B.

Although the APA was enacted in 1946, in *Heikkila v. Barber*, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1953), the Court held that it did not apply to immigration proceedings because the provision in the 1917 Immigration Act making decisions of the Attorney General "final" had the effect of precluding judicial intervention "except insofar as it was required by the Constitution." *Id.* at 606. The effect of this holding was two-fold. First, aliens in immigration proceedings could seek review only by a writ of habeas corpus, not by declaratory judgment. Second, the scope of review on habeas corpus was limited to due process issues. The standards of review in APA section 10(e), now codified at 5 U.S.C. § 706,[34] did not apply in immigration proceedings, even though APA section 10(b) provided that habeas corpus was a proper form of action for reviewing agency proceedings. *Id.* at 606–07; *cf. id.* at 604 n. 3 (quoting APA section 10(b)). Review under the statutory writ of habeas corpus, even though it may have expanded over the years, had "always been limited to enforcing due process requirements." *Id.* "To review those requirements under the Constitution, and whatever the intermediate formulation of their constituents, is a very different thing from applying a statutory standard of review, e.g., deciding on 'the whole record' whether there is substantial evidence to support administrative findings of fact under [APA] § 10(e)." *Heikkila*, 73 S.Ct. at 606.

The holding in *Heikkila* also suggests that the Constitution requires some judicial intervention in immigration proceedings, a view espoused by the Fifth Circuit and other circuits construing AEDPA section 440(a).[35] Since the 1917 Immigration Act precluded judicial intervention except insofar as required by the Constitution, cases reviewed under the 1917 Act may provide guidance for determining due process requirements.[36] As

---

33. Two district court cases from this circuit have held that the jurisdiction under § 2241 that survives AEDPA section 440(a) extends only to issues that are collateral to orders of deportation, such as custody issues, and does not include "matters upon which the deportation order was contingent, such as denial of discretionary relief from deportation." *Thomas v. INS*, 975 F.Supp. 840, 842, 849 (W.D.La.1997). *See also Ozoanya v. Reno*, 979 F.Supp. 447 (W.D.La.1997) (following *Thomas*). This holding is based on the view that matters included within the scope of direct review under INA section 106(a) could not be reviewed in habeas corpus proceedings under section 106(a)(10). Although the Second, Eighth, and Tenth Circuits adopted that view, the Fifth Circuit held in *Marcello* that the scope of review under INA sections 106(a) and 106(a)(10) is the same. *See Marcello*, 634 F.2d at 971–72; *infra* section III.C. The court in *Ozoanya* attempted to distinguish *Marcello*, but this debate need not be resolved in this case because the tension between sections 106(a) and 106(a)(10) never affected the scope of review of exclusion orders.

34. *See Heikkila*, 73 S.Ct. at 604 & n. 3 (quoting provisions of APA section 10). Courts must hold unlawful and set aside agency actions, findings, and conclusions found to be

  (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

  (B) contrary to constitutional right, power, privilege, or immunity;

  (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  (D) without observance of procedure required by law;

  (E) unsupported by substantial evidence ...; or

  (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).

35. *See supra* section III.C.

36. *But cf. Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). In *Webster*, which involved a challenge to a discretionary

examples of the scope of inquiry on habeas corpus, the Court in *Heikkila* cited to *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), and *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560 (1927). In these cases the Court reviewed agency interpretation of statutes and whether there was "some evidence" to support a fact finding. *See Bridges*, 65 S.Ct. at 1450 (holding that the Attorney General had misconstrued the term "affiliation" in statute making affiliation with the Communist Party a ground of deportation); *Vajtauer*, 47 S.Ct. at 304 ("Upon a collateral review in habeas corpus proceedings, it is sufficient that there was some evidence from which the conclusion of the administrative tribunal could be deduced . . . ."). In two post-*Heikkila* cases the Supreme Court reviewed denials of requests for suspension of deportation under the Immigration Act of 1917. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957).[37]

The 1952 INA superseded the 1917 Immigration Act and removed the barrier to review under the APA. Aliens could now seek review of both exclusion and deportation orders by declaratory judgment under the APA. *See Shaughnessy v. Pedreiro*, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955); *Brownell v. We Shung*, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956). If the alien was in custody, he also had the option of seeking review by writ of habeas corpus. *See We Shung*, 77 S.Ct. at 256. In *We Shung* the Court held that in exclusion proceedings "the scope of review is that of existing law," whether the alien seeks review by declaratory judgment or by habeas corpus. *Id.*, 77 S.Ct. at 256. Although the Court in *We Shung* never expressly defined the "existing law," logic and a careful reading of *We Shung* persuade the court that it was the APA standards of review. In an exclusion case brought soon after *We Shung* the Fifth Circuit relied on APA section 10(e) for the standard of review and held that, taken together, the 1952 INA and APA enlarge the scope of review. *See Estrada v. Ahrens*, 296 F.2d 690, 694–95 (5th Cir.1961).[38]

Before the Supreme Court had time to clarify the effect of *We Shung* on the scope of review, Congress enacted INA section 106. 8 U.S.C. § 1105a(b) (1994). Section 106 contained a standard for reviewing findings of fact that was slightly more specific than the APA standard. *Compare* INA § 106, 8 U.S.C. § 1105a(a)(4) (requiring "reasonable, substantial and probative evidence") *with* 5 U.S.C. § 706(2)(E). For issues such as abuse of discretion and agency interpretation of statutes courts relied on the APA standards of review in direct appeals of deportation orders under section 106(a). *See, e.g., Wellington v. INS*, 108 F.3d 631, 635 (5th

employment decision by the CIA, the Court stated that a "serious constitutional question" would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim, but the Court left the question open. *Id.* at 2053.

**37.** It is unclear whether *Accardi* and *Hintopoulos* should be interpreted as holding that due process requires review of agency discretion in the immigration context. If they do, the level of review may be more limited than abuse of discretion review under the APA. In *Accardi* the Court reversed the Attorney General's decision because for failure to exercise discretion, but it is unclear whether the court would have been willing to review the *manner* in which the discretion was exercised. *See Accardi*, 74 S.Ct. at 503. In *Hintopoulos* the Court observed that the denial of discretionary relief was *not* an abuse of discretion, *see* 77 S.Ct. at 621, but the Court did not expressly hold what level of review was required.

The circuit court had held that the power to suspend deportation "is a matter of grace, over which courts have no review, unless—as we are assuming—it affirmatively appears that the denial has been actuated by considerations that Congress could not have intended to make relevant." *United States ex rel. Hintopoulos v. Shaughnessy*, 233 F.2d 705 (2d Cir.1956) (quoting *United States ex rel. Kaloudis v. Shaughnessy*, 180 F.2d 489 (2d Cir.1950) (Hand, J.)).

**38.** *But cf. We Shung*, 77 S.Ct. at 254 (stating that allowing alien to seek review by declaratory judgment would not "enlarge the permissible scope of review traditionally permitted in exclusion cases"). The Court may have been referring to the fact that aliens in exclusion proceedings had no due process rights for courts to review. (When *We Shung* was decided, it had not yet been established that returning residents in exclusion proceedings have due process rights. *See Landon*, 103 S.Ct. at 329–30.)

Cir.1997).[39] Although there are very few cases addressing the scope of review· under INA section 106(b), at least one Fifth Circuit case applied the APA standards to review exclusion proceedings. *See Molina v. Sewell,* 983 F.2d 676, 679 n. 3 (5th Cir.1993).[40]

As a result of IIRIRA section 309(c)(4)(A), Sabino must rely on the traditional writ of habeas corpus under § 2241 ·for jurisdiction instead of INA section 106(b). But that does not cause the scope of habeas review to revert to what it was in *Heikkila.* Habeas corpus remains a form of proceeding under the APA, *see* 5 U.S.C. § 703, and the Fifth Circuit's decisions in *Estrada* and *Molina* indicate that after the 1952 INA removed the barrier to APA review posed by the 1917 Immigration Act, the scope of review in exclusion proceedings was governed by the APA standards.[41]

Unless agency action is "committed to agency discretion by law," *see* 5 U.S.C. § 701(a)(2), the APA requires courts to set aside exercise of agency discretion that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). In *Diaz–Resendez v. INS,* 960 F.2d 493 (5th Cir.1992), the Fifth Circuit held that a decision of the BIA regarding waivers under 8 U.S.C. § 1182(c) is reviewed for abuse of discretion. *Id.* at 495. Although the court did not cite to 5 U.S.C. § 706, it was applying the APA standard. A decision of the BIA may be reversed "if it is made without rational expla-

nation, or inexplicably departs from established policies." *Id.* at 495.[42]

## VII.

Sabino claims that the BIA departed from established policy by incorrectly applying its decision in *In re Buscemi,* 19 I. & N. Dec. 628 (1988), which requires aliens who are convicted of a "serious" drug offense to demonstrate "unusual or outstanding equities" in order to receive a discretionary waiver under 8 U.S.C. § 1182(c). *Id.* at 633. Relying on the BIA's decision in *In re Burbano,* 20 I. & N. Dec. 872 (1994), Sabino equates a "serious" drug offense with a drug trafficking .crime that constitutes an aggravated felony. *See id.* at 879 n. 4. He argues that because he was convicted of simple possession of LSD and spent only two months in jail, he . did not a commit a serious drug offense. The INS argues that Sabino's drug conviction was serious because he imported drugs into Japan and gave them to someone else, and that under the definition suggested in *Burbano* Sabino's conduct constitutes an aggravated felony.

The only evidence in the record regarding the nature of Sabino's conviction is his own statements.[43] He told the INS inspector that he was arrested in Japan because he gave ."acid" to his brother, who gave it to a friend, but the police thought that Sabino

---

**39.** *See also INS v. Doherty,* 502 U.S. 314, 112 S.Ct. 719, 728 & n. 1, 116 L.Ed.2d 823 (Scalia, J., concurring in the judgment in part and dissenting in part).

**40.** The Fifth Circuit has stated in *dicta* that a deportation hearing carries "more protective procedural and substantive rights and a stricter standard of review" than exclusion hearings. *Delgado–Carrera v. INS,* 773 F.2d 629, 632 (5th Cir.1985). But the court did not describe how the review was "stricter" or hold that the APA review standards do not apply in exclusion proceedings.

**41.** The court emphasizes that its holding addresses only exclusion cases, not deportation cases. The proper statutory interpretation of the IIRIRA's transitional rules and AEDPA section 440(a) may be to remove all jurisdiction to review deportation orders, including jurisdiction under 28 U.S.C. § 2241. Although the Fifth Circuit has indicated that the Suspension Clause requires that some habeas jurisdiction remain, *see*

*Williams,* 114 F.3d at 82, jurisdiction that survives solely by virtue of the Constitution may have a much more limited scope of review than that under the APA. ·

**42.** If the court's conclusion that the APA standards apply to exclusion proceedings is incorrect, it is possible that Sabino, as a returning resident alien, would be entitled under the Due Process Class to some review of the denial of his request for a waiver under. § 1182(c), though, as discussed above in subsection VI, perhaps under a narrower standard than the one in *Diaz–Resendez.* But the court need not reach that constitutional issue here. For the reasons discussed in the next section, Sabino is not entitled to relief even under the APA standards of review.

**43.** The Japanese court documents have not been translated and were not introduced in Sabino's exclusion proceedings.

had given it directly to the friend.[44] When he pled guilty, he faced a maximum penalty of one and one-half years.[45] Sabino later told the immigration judge that he had taken twenty strips of LSD-laced paper to Japan, with the intent to use them personally rather than sell them.[46]

The court need not decide whether Sabino's offense constitutes an aggravated felony for drug trafficking or otherwise qualifies as a serious drug offense under *Buscemi* and *Burbano*. Even if the BIA departed from its precedent in concluding that Sabino was convicted of a serious drug offense, Sabino was not prejudiced by that decision. Sabino argues that the immigration judge did not require unusual or outstanding equities, and that the BIA violated due process by applying a higher standard of review for the first time on appeal. But the need to demonstrate unusual or outstanding equities is merely a threshold requirement for receiving a favorable decision on the discretionary waiver. *See Buscemi*, 19 I. & N. Dec. at 634. Once it is met, the alien is subject to a balancing test to determine whether he should be granted a waiver. The BIA found that Sabino had unusual or outstanding equities: lawful permanent residence in the United States, a wife who is a lawful permanent resident, and three young children who are United States citizens. The BIA then proceeded to give full consideration to Sabino's request for discretionary relief.[47]

The BIA balanced all of the equities in determining whether to waive Sabino's excludability, as required by *In re Marin*, 16 I. & N. Dec. 581 (1978). In addition to considering the outstanding equities of Sabino's family and residence in this country, the BIA found that he served for three years in the United States Army and earned two medals. He paid income taxes and generally maintained employment. Nonetheless, the BIA determined that Sabino's conviction in Japan

and other negative factors outweighed the positive factors. Sabino possessed a fraudulent green card when he returned to the United States. He repeatedly used marijuana during the course of the INS exclusion proceedings, and he had failed to recognize his need for counseling for his drug addiction.[48] The BIA relied on these factors in determining that Sabino should not be granted a discretionary waiver. The court has carefully considered all of Sabino's arguments and read the INS record. The record reflects a careful consideration by the immigration judge and the BIA of the equities of Sabino's application for discretionary waiver. Nothing in the record suggests that the decision of the BIA was an abuse of discretion or is otherwise subject to being set aside under the APA, 5 U.S.C. § 706(2). Accordingly, Sabino's Application for Writ of Habeas Corpus will be denied.

## VIII.

For the reasons stated in this Opinion and Order Respondents' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket Entry No. 3) is DENIED, and Sabino's Application for Writ of Habeas Corpus (Docket Entry No. 1) will be dismissed with prejudice.

---

44. Affidavit of Ricardo Sabino at page 2, Exhibit 2 in support of Respondents' Answer and Return (Docket Entry No. 10).

45. *Id.* at page 624.

46. Transcript of January 26, 1993, exclusion hearing at pages 73–75, Exhibit 8 in support of Respondents' Answer and Return (Docket Entry No. 10).

47. *In re Sabino*, August 27, 1997, BIA Decision, Exhibit 15 in support of Respondents' Answer and Return (Docket Entry No. 10).

48. *Id.*