**Isidoro OLVERA, Petitioner,**

v.

**Janet RENO, et al., Respondents.**

**No. Civ.A. H–98–0001.**

United States District Court,
S.D. Texas,
Houston Division.

Sept. 23, 1998.

Salvador Colon, Humble, TX, for Petitioner.

Howard E. Rose, Office of U.S. Attorney, Houston, TX, for Respondents.

***MEMORANDUM AND ORDER***

LAKE, District Judge.

**I. *Introduction***

Isidoro Olvera, a citizen of Mexico who has resided legally in the United States for twenty-seven years, was convicted in 1996 of possession of between fifty and two thousand pounds of marijuana. The Immigration and Naturalization Service (INS) instituted deportation proceedings, and a hearing before an immigration judge (IJ) was held on January 22, 1997. Olvera appeared without counsel, and the IJ ordered him deported. Olvera appealed to the Board of Immigration Appeals (BIA), which dismissed the case on August 21, 1997. The BIA held that because

of his drug conviction, Olvera was not eligible for discretionary relief under 8 U.S.C. § 1182(c).

Olvera filed a petition for review in the Fifth Circuit Court of Appeals, which was dismissed for lack of jurisdiction on October 17, 1997. Olvera then filed a petition for writ of habeas corpus in this court on January 2, 1998. Olvera argues that the BIA's determination that he was not eligible for a § 1182(c) waiver violated his equal protection rights because other similarly situated aliens have been considered for a waiver. The INS filed a Motion to Dismiss (Docket Entry No. 6), arguing that the court has no subject matter jurisdiction. For the reasons set forth below, the INS's motion will be denied, but Olvera's petition for writ of habeas corpus will be dismissed with prejudice.

## II. *Subject Matter Jurisdiction*

In 1996 Congress passed the Anti–Terrorism and Effective Death Penalty Act (AEDPA), Pub.L. No. 104–132, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub.L. No. 104–208, 110 Stat. 545, both of which sought to curtail federal court jurisdiction in immigration cases. Before 1996 an alien under a final deportation order could seek direct review of a decision of the BIA in the courts of appeals.[1] *See* 8 U.S.C. § 1105a(a) (1994); *United States ex rel. Marcello v. District Director, INS,* 634 F.2d 964, 968 (5th Cir.1981). If the alien was in custody he also had the option of seeking judicial review by writ of habeas corpus. *See* 8 U.S.C. § 1105a(a)(10) (1994); *Marcello,* 634 F.2d at 968–71.

Section 401(e) of the AEDPA, captioned "Elimination of Custody Review by Habeas Corpus," eliminated the old § 1105a(a)(10).

110 Stat. 1268. Section 440(a) of the AEDPA added a new § 1105a(a)(10):

> Any final order of deportation against an alien who is deportable by reason of having committed [certain criminal offenses], shall not be subject to review by any court.

110 Stat. 1267–77. The criminal offenses enumerated in this provision include the drug offense for which Olvera was found deportable.

As federal courts began to assess the effect of section 440(a) on their jurisdiction, Congress enacted the IIRIRA on September 30, 1996. The IIRIRA made fundamental changes in immigration law and procedure and repealed 8 U.S.C. § 1105a (1994), replacing it with a new, more restrictive statute governing judicial review, 8 U.S.C. § 1252. *See Sabino v. Reno,* 8 F.Supp.2d 622, 625 (S.D.Tex.1998).[2] These changes do not apply, however, to aliens placed in deportation proceedings before April 1, 1997, and judicial review of such proceedings is conducted without regard to the new 8 U.S.C. § 1252. *See Sabino,* 8 F.Supp.2d at 631–34; IIRIRA § 309(c)(1), 110 Stat. 3009–625, *amended by* Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657. The INS initiated proceedings in this case on December 2, 1996.[3]

■ The issue in this case is whether AEDPA section 440(a) prevents this court from exercising jurisdiction over Olvera's petition for writ of habeas corpus. The circuit courts have uniformly held that section 440(a) eliminated their authority to conduct direct review of deportation proceedings for the defined class of criminal aliens, which they previously exercised under 8 U.S.C. § 1105a(a). *See, e.g., Williams v. INS,* 114 F.3d 82, 83 (5th Cir.1997); *Yang v. INS,* 109 F.3d 1185, 1194–97, (7th Cir.1997); *Boston–*

---

1. All aliens have the right to appeal decisions of an IJ to the BIA, which is the final step in the administrative process.

2. In *Sabino* this court discussed at length many of the jurisdictional issues in the present case. Instead of repeating that analysis, the court will cite to portions of *Sabino* that provide background for this Memorandum and Order.

3. Olvera's proceedings became final on August 21, 1997, when the BIA dismissed his appeal.

*See* 8 C.F.R. § 243.1. Because that date was after October 31, 1996, this case comes within the scope of the IIRIRA's transitional rules for judicial review. *See* IIRIRA § 309(c)(4), 110 Stat. 3009–626, 110 Stat. 625, *amended by* Act of Oct. 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657. Although the INS argues that Olvera's habeas petition is barred by IIRIRA sections 309(c)(4)(G) and 309(c)(4)(C), these rules apply only to petitions for review filed in the courts of appeals. *See Sabino,* 8 F.Supp.2d at 636 n. 28.

*Bollers v. INS,* 106 F.3d 352, 355 (11th Cir. 1997); *Kolster v. INS,* 101 F.3d 785, 790–91 (1st Cir.1996); *Salazar–Haro v. INS,* 95 F.3d 309, 311 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997); *Hincapie–Nieto v. INS,* 92 F.3d 27, 30–31 (2d Cir.1996). The Fifth Circuit, however, in response to a constitutional challenge to section 440(a), followed the Seventh Circuit in observing that " 'limited opportunity to apply for a writ of habeas corpus may remain'—at minimum 'the writ that Art. 1, § 9, cl. 2 preserves against suspension.' " *Williams,* 114 F.3d at 84 (quoting *Yang,* 109 F.3d at 1195). Article 1, section 9, clause 2 of the Constitution states that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Other circuits have held more generally that criminal deportees may still seek judicial review of constitutional claims. *Salazar–Haro,* 95 F.3d at 311 ("To the extent, therefore, that constitutional rights applicable to aliens may be at stake, judicial review may not be withdrawn by statute."); *Hincapie–Nieto,* 92 F.3d at 31 (concluding that section 440(a)'s repeal of direct review is constitutional on the basis of representations by the INS that some avenue of judicial relief remains available for core constitutional concerns); *Kolster,* 101 F.3d at 791 (same).

In the past two years numerous aliens who were barred from seeking direct review of deportation orders in the circuit courts by AEDPA section 440(a) have filed habeas corpus petitions in federal district courts. Almost without exception, the district courts have found jurisdiction to review these petitions under the traditional writ of habeas corpus statute, 28 U.S.C. § 2241.[4] *See, e.g., Gutierrez–Martinez v. Reno,* 989 F.Supp.

1205 (N.D.Ga.1998); *Morisath v. Smith,* 988 F.Supp. 1333 (W.D.Wash.1997); *Jurado–Gutierrez v. Greene,* 977 F.Supp. 1089 (D.Colo. 1997); *Ozoanya v. Reno,* 968 F.Supp. 1 (D.D.C.1997); *Vargas v. Reno,* 966 F.Supp. 1537 (S.D.Cal.1997); *Sanchez v. District Director, INS,* 962 F.Supp. 1210 (D.Neb.1996); *Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y. 1997). Section 2241(c)(1), which is descended directly from the Judiciary Act of 1789, authorizes federal courts to grant a writ of habeas corpus to a prisoner "in custody under or by color of the authority of the United States."[5]

Some courts have relied on *Ex parte Yerger,* 75 U.S. (8 Wall.) 85, 19 L.Ed. 332 (1868), and *Felker v. Turpin,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), as a basis for concluding that Congress did not speak clearly enough in AEDPA section 440(a) to repeal habeas jurisdiction under § 2241. *See, e.g., Gutierrez–Martinez,* 989 F.Supp. at 1209; *Morisath,* 988 F.Supp. at 1339; *Yesil,* 958 F.Supp. at 838. Both *Yerger* and *Felker* construed statutes that narrowed the Supreme Court's jurisdiction in habeas cases. The statute at issue in *Yerger* prohibited direct appeals to the Supreme Court of habeas decisions by lower courts. *See* 75 U.S. (8 Wall.) at 105. In *Felker* the statute at issue prohibited appeals and petitions for certiorari from decisions by the circuit courts to grant or deny motions for leave to make a successive habeas application. *See* 116 S.Ct. at 2337–39. In both cases the Supreme Court concluded that Congress had not repealed its jurisdiction to hear original habeas petitions under § 2241. In contrast to the narrow jurisdictional proscriptions at issue in *Yerger* and *Felker,* however, AEDPA section 440(a) contains a categorical prohibition on judicial review "by any court."[6] This court con-

---

**4.** The term "traditional" is used to distinguish the writ of habeas corpus authorized by 28 U.S.C. § 2241 from the post-conviction remedies found in 28 U.S.C. §§ 2254 & 2255.

**5.** For many years the writ of habeas corpus was the only method for reviewing immigration proceedings, *see Heikkila v. Barber,* 345 U.S. 229, 73 S.Ct. 603, 604, 97 L.Ed. 972 (1953), and it remained an alternate source of jurisdiction after Congress enacted the review provisions of 8 U.S.C. § 1105a (1994). For a more detailed discussion of the history of the writ of habeas

corpus and its use in immigration cases see *Sabino,* 8 F.Supp.2d at 627–30.

**6.** For a full discussion of *Yerger* and *Felker* see *Sabino,* 8 F.Supp.2d at 634–35. *See also id.* at 637 & n. 31, 116 S.Ct. 2333 (describing difference between AEDPA section 440(a) and IIRIRA § 309(c)(4)(A), the transitional rule applicable in exclusion cases, which this court held in *Sabino* did not satisfy *Yerger* and *Felker* standards for repealing jurisdiction under 28 U.S.C. § 2241).

cludes that section 440(a) expressly repeals all federal court jurisdiction over the deportation orders of the defined class of criminal aliens, including jurisdiction under § 2241. Nevertheless, because the Fifth Circuit said in *Williams* that the Constitution prevents Congress from suspending the writ of habeas corpus for the class of criminal deportees to which Olvera belongs, 114 F.3d at 84, the court must assume that habeas jurisdiction is constitutionally required in this case despite the language of section 440(a).[7]

### III. *Scope of Review*

■ Among the district courts that have found jurisdiction to review deportation orders under § 2241, there has been considerable debate over the proper scope of review. *See, e.g., Mbiya v. INS*, 930 F.Supp. 609 (N.D.Ga.1996) (holding that courts may only review claims for "fundamental miscarriage of justice"); *Mojica v. Reno*, 970 F.Supp. 130

(E.D.N.Y.1997) (holding that courts may review nonconstitutional claims). The precise scope of review need not be determined in this case, however, because courts are generally agreed that jurisdiction under § 2241 must extend at least to claims of substantial constitutional error. *See Sabino*, 8 F.Supp.2d at 638 (citing cases). Olvera's claim that the BIA violated his equal protection rights raises the possibility of substantial constitutional error.[8]

### IV. *Equal Protection Challenge*

■ The BIA held that Olvera was not eligible for a discretionary waiver of deportability under 8 U.S.C. § 1182(c) (1994) because of his drug conviction.[9] In the AEDPA Congress amended § 1182(c) to make relief unavailable to aliens who are "deportable by reason of having committed [certain criminal offenses]." AEDPA § 440(d), 110 Stat. 1277.[10] The enumerated offenses are

7. The court need not decide the conceptual question of whether such jurisdiction arises directly from the Suspension Clause, U.S. Const. art. 1, § 9, cl. 2, *see Yang*, 109 F.3d at 1195 (referring to the "constitutional writ, unaided by statute") (relied on in *Williams*), or whether the Suspension Clause prevents Congress from eliminating jurisdiction under § 2241. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 2 L.Ed. 554 (1807) (Marshall, J.) (stating that the power to award the writ of habeas must be given by written law, and that the Suspension Clause became effectual only after Congress passed section 14 of the Judiciary Act of 1789, the ancestor of § 2241).

8. Two district court cases from this circuit have held that the jurisdiction under § 2241 that survives AEDPA section 440(a) extends only to issues that are collateral to orders of deportation, such as custody issues, and does not include "matters upon which the deportation order was contingent, such as denial of discretionary relief from deportation." *Thomas v. INS*, 975 F.Supp. 840, 842, 849 (W.D.La.1997). *See also Ozoanya v. Reno*, 979 F.Supp. 447 (W.D.La.1997) (following *Thomas*). This holding is based on the view that matters included within the scope of direct review under 8 U.S.C. § 1105a(a) could not be reviewed in habeas corpus proceedings under § 1105a(a)(10). *See Sabino*, 8 F.Supp.2d at 629 (discussing cases which have adopted this view). In *Marcello* the Fifth Circuit held that the scope of review under § 1105(a) and § 1105a(a)(10) is the same. *See Marcello*, 634 F.2d at 971–72. A later Fifth Circuit case, however, adopted the more restrictive view of § 1105a(a)(10), *see Garcia v. Boldin*, 691 F.2d 1172, 1183 (5th Cir.1982), and the court in *Thomas* relied on *Garcia*. *See Thomas*, 975 F.Supp. at 842. But one appellate

panel cannot overrule a decision of a prior panel. *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 n. 2 (5th Cir.1992). When a lower court is faced with two conflicting opinions, the earlier opinion controls. *United States v. Miro*, 29 F.3d 194, 199 n. 4 (5th Cir.1994). Because *Marcello* remains the law in this circuit, this court declines to adopt the restrictive view of § 1105(a)(10) in *Thomas* and *Garcia*.

9. In the IIRIRA Congress repealed § 1182(c), *see* IIRIRA § 304(b), 110 Stat. 3009–597, but the repeal does not affect deportation proceedings pending before April 1, 1997. *See* IIRIRA § 309(c)(1), 110 Stat. 3009–625, *amended by* Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657. The IIRIRA replaced § 1182(c) with a procedure called "cancellation of removal." *See* 8 U.S.C. § 1229b. One of Olvera's arguments in this case is that the IJ should have permitted him to seek cancellation of removal under § 1229b. The argument is incorrect because § 1229b does not apply to deportation proceedings pending before April 1, 1997, just as the repeal of § 1182(c) does not apply to such pending proceedings. *See* IIRIRA § 309(c)(1), 110 Stat. 3009–625, *amended by* Act of October 11, 1996, Pub.L. No. 104–302, 110 Stat. 3656, 3657.

10. Although some cases have discussed whether section 440(d) applies retroactively to requests for § 1182(c) relief that were pending when the AEDPA was enacted, *see, e.g., Goncalves v. Reno*, 144 F.3d 110 (1st Cir.1998), that issue does not arise in this case because Olvera's deportation proceedings began after the AEDPA was enacted.

the same as those listed in AEDPA section 440(a) and include Olvera's drug offense. In order to respond to Olvera's equal protection challenge to the BIA's ruling, the court must first recount the history behind 1182(c).

When § 1182(c) was adopted as part of the 1952 Immigration and Nationality Act (INA), Congress distinguished between the *exclusion* of aliens who arrived at our shores seeking admission to the United States, and the *deportation* of aliens who were physically present within our borders. The grounds for exclusion were broader than those for deportation, and the procedural protections were narrower in exclusion proceedings than in deportation proceedings. *See Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982); *Sabino,* 8 F.Supp.2d at 625–26. A legal resident alien was only subject to deportation proceedings as long as he remained in the United States. If a legal resident alien traveled abroad and returned to the United States, however, he was subject to being placed in exclusion proceedings and denied entry on the same broad grounds, and by the same narrow procedures, as an alien seeking to enter for the first time. *See Sabino,* 8 F.Supp.2d at 624.[11]

Under 8 U.S.C. § 1182(c) (1994) the Attorney General had discretion to admit an otherwise excludable alien who "temporarily proceeded abroad voluntarily" and was returning to a lawful, unrelinquished domicile of seven consecutive years. A similar type of discretionary relief was available to aliens in deportation proceedings, but it had much stricter eligibility requirements. *See* 8 U.S.C. § 1254(a)(2) (1994), *repealed by* IIRIRA § 308(b)(7), 110 Stat. 3009–615. An alien who was deportable for a serious criminal offense generally had to prove that he had resided in the United States for ten years after commission of the offense and had possessed good moral character throughout that

period. *Id.* The Attorney General could grant relief only if deportation would result in "exceptional and extremely unusual hardship." *Id.*

In *Francis v. INS,* 532 F.2d 268 (2d Cir. 1976), the court required the INS to permit aliens in deportation proceedings who had lawfully resided in the United States for seven years to seek relief under § 1182(c), even if they had not traveled abroad and returned to the United States. *Id.* at 272–73. The court discussed a number of decisions in which the BIA had granted § 1182(c) relief to aliens who were in deportation proceedings. In *Matter of Smith,* 11 I. & N.Dec. 325 (1965), a deportable alien requested an "adjustment of status" to that of an alien lawfully admitted for permanent residence pursuant to 8 U.S.C. § 1255. Because an applicant for adjustment of status was subject to all the grounds for exclusion, the BIA held that there is "no valid reason for denying him the benefits of [§ 1182(c) ] on the technical ground that he is not returning to the United States after a voluntary departure." *Smith* at 327. The BIA had also extended § 1182(c) to deportable aliens who temporarily left the United States at some point between the commission of the act that made them deportable and the commencement of deportation proceedings. *See Francis,* 532 F.2d at 270–71. If the alien had a meritorious case for discretionary relief, the BIA would order that the alien be regarded as having been lawfully admitted at the time he returned to the United States; the alien could not then be deported for what had been waived as a ground for exclusion. *See, e.g., Matter of G.A.,* 7 I. & N.Dec. 274, 275–76 (1956). This practice, which originated in 1940 under the statutory predecessor to § 1182(c), was considered to be a *nunc pro tunc* exercise of 1182(c) authority.[12] *See Matter of L.,* 1 I. & N.Dec. 1 (1940).[13] In

---

**11.** In the IIRIRA Congress merged exclusion and deportation proceedings into a single set of procedures called "removal," but retained many of the distinctions of the 1952 INA. *See Sabino,* 8 F.Supp.2d at 625.

**12.** *Cf.* Black's Law Dictionary 964 (1979) (defining *nunc pro tunc* as "now for then. . . . A phrase applied to acts allowed to be done after the time when they should have been done, with a retro-

active effect, i.e., with the same effect as if regularly done.").

**13.** The petitioner in *Matter of L.* was a legal resident who came to the United States in 1909. In 1924 he pled guilty to a charge of larceny (for taking a watch from a fellow worker while drunk) and received a sentence of probation. In 1939 he traveled to his native village in Yugoslavia to visit his seriously ill sister, and returned

*Matter of S.*, 6 I. & N.Dec. 392 (1954), decided shortly after Congress enacted § 1182(c), the BIA reviewed its legislative history and concluded that Congress did not intend to prohibit the practice of granting discretionary relief *nunc pro tunc.*

In *Francis* the BIA refused to consider the petitioner for § 1182(c) relief because, unlike the aliens in the *nunc pro tunc* cases, he had not traveled abroad. The Second Circuit found that the "equal protection guarantee"[14] applied to deportation proceedings, and that a minimal scrutiny test was appropriate. *Francis*, 532 F.2d at 272. The court concluded that there was no rational basis for distinguishing between aliens who had traveled abroad and those who had not, and that the BIA's interpretation of § 1182(c) and was unconstitutional as applied to the petitioner:

> Fundamental fairness dictates that permanent resident aliens who are in like circumstances, but for irrelevant and fortuitous circumstances, be treated in a like manner. We do not dispute the power of Congress to create different standards of admission and deportation for different groups of aliens. However, once those choices are made, individuals within a particular group may not be subjected to disparate treatment on criteria wholly unrelated to any legitimate government interest.

*Id.* at 273 (footnote omitted). The Solicitor General did not file a petition for certiorari in *Francis*, and the BIA announced its intention to follow *Francis* nationwide in *Matter of Silva*, 16 I & NDec. 26, 30 (1976).

In the AEDPA Congress amended § 1182(c) to make relief unavailable to an alien who is "*deportable* by reason of having committed [certain criminal offenses]." AEDPA § 440(d), 110 Stat. 1277 (emphasis added). Section 440(d) did not mention *excludable* aliens, and in *In re Fuentes–Campos*, Int.Dec. No. 3318, 1997 WL 269368 (BIA May 14, 1997), the BIA held that aliens in exclusion proceedings could continue to seek relief under § 1182(c). In *Fuentes–Campos* the INS had argued that the term *deportable* encompassed *excludable* aliens, but the BIA disagreed. *See id.* ("The Service is asking the Board to read into section 440(d) language that was not included.... The language of the amendment is clear and unambiguous in its face—it precludes relief for designated aliens in deportation proceedings.... Congress, which had created these important distinctions between exclusion and deportation proceedings, was obviously aware of them when it enacted the AEDPA."). The INS had also argued that under *Francis* it would be unconstitutional to extend § 1182(c) relief to excludable but not deportable aliens, and that Congress did not intend to create such an unconstitutional result. The BIA explained that the equal protection issue in *Francis* was not present because the "administrative case law which led up to *Francis*," including the "arguable extensions" of § 1182(c) in *Smith* (to deportable aliens who applied for adjustment of status) and the *nunc pro tunc* cases (to deportable aliens who had traveled abroad), might no longer apply in deportation proceedings because of section 440(d).

The BIA addressed the effect of section 440(d) in deportation proceedings in *In re*

to the United States two months later. He did not inform the customs officer about his 1924 conviction, and he was allowed to enter. The INS later placed him in deportation proceedings and found that he was deportable for entering the United States after being previously convicted of a crime. (The larceny conviction by itself was not a ground for deportation because (1) it was not committed within five years of the petitioner's entry into the United States and (2) the petitioner was not sentenced to imprisonment for a year or more.) The Attorney General observed that if the petitioner had been placed in exclusion proceedings upon his return to the United States, the merits of his case would have resulted in a discretionary waiver under the statutory predecessor to 8 U.S.C. § 1182(c). The Attorney General held that the authority to grant such relief was not required to be exercised "at the precise time of readmission" but that a "later, corrective exercise"—described as *nunc pro tunc*—was proper.

**14.** The court relied on the equal protection aspect of the Fifth Amendment, citing *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 1164 n. 4, 39 L.Ed.2d 389 (1974), which stated that "if a classification would be invalid under the Equal Protection Clause of the Fourteenth Amendment, it is also inconsistent with the due process requirement of the Fifth Amendment."

*Gonzalez–Camarillo,* Int.Dec. No. 3320, 1997 WL 362671 (BIA June 19, 1997). The IJ had concluded that the petitioner was not eligible for § 1182(c) relief because of his criminal conviction. The petitioner, who had requested an adjustment of status, argued that he was eligible for § 1182(c) relief under *Smith.* The BIA held that *Smith* did not apply to the deportable aliens designated in section 440(d). The BIA reasoned that when *Smith* was decided § 1182(c) contained no language that was inconsistent with the BIA's decision to extend discretionary relief to deportable aliens who applied for adjustment of status. Citing *Matter of S.,* 6 I. & N.Dec. 392 (1954), the BIA also observed that when Congress enacted § 1182(c) it failed to disapprove of the practice of granting *nunc pro tunc* relief to deportable aliens who had traveled abroad. The BIA then turned to the legislative history of section 440(d), which stated that the purpose of amending § 1182(c) was to enhance the ability of the United States to deport criminal aliens. The BIA concluded that "[i]n light of this statement of congressional intent, it cannot be said that the statute permits us to continue to apply our prior case law to deportable aliens within the scope of section 440(d) in disregard of its unambiguous mandate." While the holding in *Gonzalez–Camarillo* applies only to deportable aliens who apply for adjustment of status under *Smith,* the BIA's language and reasoning imply that it will no longer grant § 1182(c) relief *nunc pro tunc* to the deportable aliens designated in section 440(d).

The petitioner in *Gonzalez–Camarillo* also argued that to allow excludable aliens but not deportable aliens to seek § 1182(c) relief violated equal protection principles. The BIA pointed out that the distinction held unconstitutional in *Francis* was between different types of *deportable* aliens and had been created administratively, but that the distinction between excludable and deportable aliens was created by section 440(d) itself. The

BIA then noted that it did not have authority to question the constitutionality of a statutory scheme; its duty was to apply the law as written.

Relying on *Francis,* Olvera argues that denying discretionary relief only to the deportable criminal aliens in section 440(d) is irrational. The court disagrees. In the first place, as the BIA pointed out in *Gonzalez–Camarillo,* the situation that led to *Francis* is much different from that under AEDPA section 440(d). When *Francis* was decided the BIA's decisions in *Smith* and the *nunc pro tunc* cases had extended § 1182(c) relief to many aliens in deportation proceedings who did not appear to be entitled to such relief under a straightforward reading of the statute. The only aliens whom the BIA would not allow to seek relief under § 1182(c) were deportable aliens who had not traveled abroad and who could not apply for adjustment of status. *See Francis,* 532 F.2d at 271. By expanding the statute beyond its literal terms, the BIA had created a situation in which some deportable aliens received different treatment from other deportable aliens based on seemingly "irrelevant and fortuitous factors." *Francis,* 532 F.2d at 273. The court in *Francis* attempted to solve this problem by extending § 1182(c) relief to the deportable aliens who were, in its opinion, being arbitrarily left out. In contrast to *Smith* and the *nunc pro tunc* cases, the BIA's decision in *Fuentes–Campos* did not administratively extend § 1182(c); it simply recognized that the language of section 440(d) does not apply to excludable aliens.[15] Unlike the distinction between different types of deportable aliens that *Francis* attempted to remedy, the BIA's present distinction between excludable aliens and deportable aliens is based on section 440(d) and is manifest in the statute.[16]

To scrutinize section 440(d) on equal protection grounds would be inconsistent with Congress's broad power over immigration

---

**15.** *But see Vargas v. Reno,* 966 F.Supp. 1537, 1546 (S.D.Cal.1997) (holding that section 440(d) was facially neutral and intended to apply both to excludable and deportable aliens); *Jurado–Gutierrez v. Greene,* 977 F.Supp. 1089, 1093 (D.Colo.1997) (same).

**16.** The deportable aliens designated in section 440(d) include the great majority of aliens with ongoing deportation proceedings, if published cases are any guide. Whether § 1182(c) relief remains available to aliens who are deportable on grounds other than those listed in section 440(d) is not an issue in this case.

policy. In *Lem Moon Sing v. United States,* 158 U.S. 538, 15 S.Ct. 967, 39 L.Ed. 1082 (1895), the Supreme Court stated:

> The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

*Id.* at 970, 15 S.Ct. 967. *See also Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the admission of aliens); *Nishimura Ekiu v. United States,* 142 U.S. 651, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892) ("It is an accepted maxim of international law that every sovereign nation has the power, as inherent in sovereign, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.").

Although the Supreme Court has held that the *procedures* for deporting or excluding resident aliens must comply with due process requirements, *see Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982), the Court has without exception sustained Congress's "plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden." *Kleindienst v. Mandel,* 408 U.S. 753, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972) (quoting *Boutilier v. INS,* 387 U.S. 118, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967)). Congress's power to authorize discretionary waivers of grounds for exclusion or deportation is a subset of its power to determine the grounds upon which to exclude or deport an alien in the first place. This court therefore lacks authority to question the decision of Congress in section 440(d) to deny discretionary relief to the designated class of deportable aliens.

■ Assuming *arguendo* that it would be proper to scrutinize section 440(d) on equal protection grounds, the court concludes that Congress could have had a rational basis for denying deportable aliens the right to seek relief under § 1182(c) but allowing excludable aliens this right. Under the rational basis standard a statute is unconstitutional "only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). A statutory distinction will not be set aside if any state of facts reasonably may be conceived to justify it. *Id.* The effect of section 440(d) was to revert to the system that existed when Congress first enacted § 1182(c), with respect to the designated class of deportable aliens. Returning resident aliens in exclusion proceedings can continue to seek relief under § 1182(c) if they met its eligibility requirements, but the aliens designated in section 440(d) must now rely on the more restrictive provision for suspension of deportation in 8 U.S.C. § 1254 (1994). This dual system may reflect Congress's appreciation of the many substantive and procedural differences between exclusion proceedings and deportation proceedings.

An alien could be excluded on many grounds that were not grounds for deportation, including poor health and the likelihood that he would become a public charge. *See* 8 U.S.C. § 1182(a)(1)(A) & (4) (1994). Grounds for exclusion often had a much lower evidentiary standard than a corresponding ground for deportation. For example, an alien could be excluded if he merely admitted committing acts that constitute the essential elements of a drug offense or crime of moral turpitude. *See* 8 U.S.C. § 1182(a)(2)(A) (1994). An alien could not be deported for a drug offense or crime of moral turpitude, however, unless he had been convicted of such an offense. *See* 8 U.S.C. § 1251(a)(2) (1994). An alien could be excluded if the immigration officer had "reason to believe" that he had been an illicit drug trafficker or had assisted such traffic, *see* 8 U.S.C. § 1182(a)(2)(C), but he could not be deported on this ground.

There were also significant procedural differences between exclusion and deportation proceedings, especially when Congress first enacted the 1952 INA. Exclusion proceedings were generally conducted at the port of en-

try, sometimes with little advance warning. *See Landon v. Plasencia,* 459 U.S. 21, 103 S.Ct. 321, 325, 74 L.Ed.2d 21 (1982). Deportation proceedings, however, were generally conducted near the alien's residence, often after the alien had been convicted of a crime that made him deportable. This experience gave the deportable alien familiarity with legal procedures and representation that an alien in exclusion proceedings often lacked. In deportation proceedings the burden of proof was on the government, but in exclusion proceedings it was on the alien. *See* 8 U.S.C. § 1361 (1994). An alien in deportation proceedings had procedural safeguards, including the right to have advance notice of the charges against him and to cross-examine witnesses, that were not guaranteed by statute in exclusion proceedings. *Compare* 8 U.S.C. § 1252(b)(1)–(4) (1994) (listing rights in deportation proceedings) *with* 8 U.S.C. § 1226(a) (1994) (directing the immigration judge to interrogate and cross-examine witnesses in exclusion proceedings).

By regulation the INS later extended some of these safeguards to exclusion proceedings, *see* 8 C.F.R. § 236.2(a), and court decisions established that resident aliens in exclusion proceedings had due process rights, including advance notice of charges, and were entitled to have the government bear the burden of proof. *See Landon,* 103 S.Ct. at 329–31; *Kwong Hai Chew v. Rogers,* 257 F.2d 606 (D.C.Cir.1958). Nonetheless, differences between exclusion and deportation proceedings remained, even for the resident alien. *See Landon,* 103 S.Ct. at 325 (discussing rights such as voluntary departure and the ability to designate country of deportation that were limited to deportation proceedings). Perhaps the most important difference was that the Attorney General, who is ultimately responsible for enforcing immigration laws but has delegated much of that responsibility to the INS, had discretion to refrain from instituting deportation proceedings against aliens who appeared to be deportable. *See Johns v. Department of Justice,* 653 F.2d 884, 889 (5th Cir.1981) (comparing Attorney General's discretion to that in enforcing criminal laws). As to aliens attempting to enter (or reenter), however, Congress provided that "[e]very alien . . . who may not appear to the examin-

ing immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry by the special inquiry officer." 8 U.S.C. § 1225(b) (1994). The special inquiry officer was to decide whether to exclude the alien "based only on the evidence produced at the inquiry." 8 U.S.C. § 1226(a).

It was certainly not irrational for Congress to provide the discretionary relief in § 1182(c) only to the narrow class of aliens who, after residing legally in the United States for at least seven years, returned from a trip abroad only to wind up in exclusion proceedings. If any of the numerous grounds for exclusion appeared, even if the ground seemed minor when compared with the alien's merits, immigration officials were required to institute exclusion proceedings. In contrast, a comparable resident alien who never left the United States was subject only to the narrower grounds for deportation, and had the procedural advantages of deportation proceedings. Moreover, deportation proceedings were instituted only after a deliberate decision of the INS. Congress may rationally have decided that deportable aliens did not deserve any extra opportunity for administrative discretion.

Olvera's petition for writ of habeas corpus is based on the claim that the deportation order entered against him is invalid because the BIA violated his equal protection rights by denying him the opportunity for relief under § 1182(c). The court concludes that Olvera's petition must be dismissed because (1) Congress's decision to distinguish between excludable and deportable aliens in section 440(d) is not subject to an equal protection challenge, and (2) even if section 440(d) were subject to an equal protection challenge, Congress could have had a rational basis for denying § 1182(c) relief only to the designated class of deportable aliens.

## V. *Order*

The INS's motion to dismiss for subject matter jurisdiction (Docket Entry No. 6) is **DENIED,** and Olvera's petition for writ of habeas (Docket Entry No. 1) corpus will be dismissed with prejudice.

## FINAL JUDGMENT

In accordance with the Memorandum and Order entered today, this action is **DISMISSED with prejudice.**

This is a **FINAL JUDGMENT.**